ESTATE OF Patricia E. GILMORE, Joseph P. Gilmore, Executor, Plaintiff, Appellant,

v.

John J. BUCKLEY, et al., Defendants, Appellees.

No. 85–1439.

United States Court of Appeals, First Circuit.

Argued Nov. 12, 1985.

Decided March 31, 1986.

Kiernan B. Meagher with whom Robert J. Owens, Robert D. City and Robert J. Owens Associates, P.C., Boston, Mass., were on brief for appellant.

Peter A. Biagetti with whom Thomas R. Murtagh and Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, Mass., were on brief for appellees County of Middlesex and John L. Danehy.

Edward E. Kelly and Barron & Stadfeld, Boston, Mass., on brief for appellees S. Lester Ralph and Michael E. McLaughlin.

Cynthia J. Cohen and Meehan, Boyle & Cohen, P.C., Boston, Mass., on brief for appellee John J. Buckley.

Roberta Thomas Brown with whom Francis X. Bellotti, Atty. Gen., and Paula J. DeGiacomo, Asst. Atty. Gen., Boston, Mass., were on brief for appellees James Gilligan, Robert A. Fein and Dennis F. Koson.

Lee Carl Bromberg, Benjamin J. Naitove and Bromberg, Sunstein & McGregor, Boston, Mass., on brief for appellee Ralph J. Bens.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and WYZAN-SKI,* Senior District Judge.

LEVIN H. CAMPBELL, Chief Judge.

On December 20, 1979, Patricia Gilmore was murdered by Bradford Prendergast, a Billerica House of Correction inmate, while Prendergast was on leave from the House of Correction on a two-day furlough. Plaintiff-appellant Joseph P. Gilmore, administrator of the estate of Patricia Gilmore, brought this civil rights action under 42 U.S.C. § 1983 (1982) in the United States District Court for the District of Massachusetts against defendants-appellees Middlesex County, the Middlesex County Commissioners, the Sheriff of Middlesex County, the Superintendent of the Billerica House of Correction, and the Medical Director and two assistants at Bridgewater State Hospital. The complaint alleges that various acts and omissions of the defendants proximately caused Gilmore's murder by Prendergast, depriving her of life without due process of law in violation of the fourteenth amendment. The complaint further alleges that the defendants are liable for Gilmore's death under state tort law. Upon cross-motions for summary judgment, the district court awarded summary judgment to the defendants on the section 1983 claims, and declined to exercise jurisdiction over the pendent state law claims. *Estate of Gilmore v. Buckley*, 608 F.Supp. 554 (D.Mass.1985). We affirm.

---

* Of the District of Massachusetts, sitting by designation.

## I.

The relevant facts, essentially undisputed, may be summarized as follows. On July 2, 1979, acting on a criminal complaint filed by Patricia Gilmore, the Norfolk County District Attorney charged Bradford Prendergast with threatening her life in violation of Mass.Gen.Laws ch. 275, § 2 (1984).[1] On July 12, Prendergast was arraigned in Stoughton District Court and ordered hospitalized at Bridgewater State Hospital for observation and an evaluation of his competency to stand trial. On August 15, 1979, Dr. Anneliese A. Pontius, a Bridgewater psychiatrist, reported to the court that Prendergast was "not suffering from any major mental illness" and that he was "competent to stand trial."

Shortly thereafter, on August 17, 1979, defendant Dr. Robert A. Fein, a clinical and forensic psychologist at Bridgewater, filed a superseding report with the court concluding that, "based on additional information," Prendergast was "mentally ill" and that "failure to hospitalize [him] in strict security would constitute a likelihood of serious harm to himself as well as others." The "additional information" referred to by Fein was a medical report on Prendergast from McLean Hospital in Belmont, Massachusetts, where Prendergast had voluntarily committed himself between February and April of 1979, and been treated by Fein and others. Elsewhere in his report to the court, Fein suggested that "Prendergast's recent medical history indicates that he is an individual with high potential for doing serious, if not murderous, harm to at least one potential victim [Gilmore] and to himself." Fein recommended that, if found guilty, Prendergast be returned to Bridgewater for further hospitalization and recommendations.

On August 20, 1979, Prendergast was found guilty of threatening Patricia Gilmore under Mass.Gen.Laws ch. 275, § 2, and returned to Bridgewater to aid the court in sentencing pursuant to Mass.Gen. Laws ch. 123, § 15(e) (1984).[2] In a note dated September 11 to Dr. Park Dietz, the director of forensic psychiatry at Bridgewater, Fein suggested that Dietz assign "someone senior" to do the 15(e) evaluation of Prendergast, because Prendergast was "paranoid about [Fein] enough already." Dietz assigned Dr. Dennis Koson, a forensic psychiatrist who had recently joined the staff at Bridgewater after working for the Michigan Department of Corrections, to do the 15(e) evaluation. Dietz informed Koson that Prendergast was a "Tarasoff case,"[3] and advised Koson to speak with Dr. Fein for further details. Koson met with Fein and reviewed Prendergast's

---

1. Chapter 275, section 2, provides,

    *Complaint of threat to commit crime*

    If complaint is made to any such court or justice that a person has threatened to commit a crime against the person or property of another, such court or justice shall examine the complainant and any witnesses who may be produced, on oath, reduce the complaint to writing and cause it to be subscribed by the complainant.

2. Chapter 123, section 15(e), provides,

    After a finding of guilty on a criminal charge, and prior to sentencing, the court may order a psychiatric or other clinical examination and, after such examination, it may also order a period of observation in a facility or at the Bridgewater state hospital if the court determines that strict security is required and if such person is a male. The purpose of such observation or examination shall be to aid the court in sentencing. Such period of observation or examination shall not exceed forty days. During such period of observation, the superintendent or medical director may petition the court for commitment of such person. The court may hear the petition ..., and if the court makes the necessary findings, it may in its discretion commit the person to a facility or the Bridgewater state hospital. Such order of commitment shall be valid for a period of six months....

3. Tatiana Tarasoff was murdered by Prosenjit Poddar two months after Poddar allegedly confided his intention to kill her to a psychologist employed by the University of California. *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976) (in bank). The Supreme Court of California held that, under California law, a psychotherapist who determines, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, bears a duty to exercise reasonable care to protect the foreseeable victim of that danger.

Bridgewater file, which contained an abstract of his McLean record. Koson also met briefly with Prendergast on two occasions, but Prendergast refused to submit to an examination. Finally, Koson attended a conference with Fein and an assistant district attorney, at which the district attorney informed Koson of his desire to have Prendergast committed to Bridgewater under section 15(e), and furnished Koson with an affidavit from Patricia Gilmore detailing the history of her relationship with Prendergast and his threatening behavior.

On September 28, 1979, Koson reported to the court as follows:

Mr. Prendergast, having been found guilty on a charge of threats, and committed to Bridgewater State Hospital pursuant to MGL 123, Section 15(e), for psychiatric examination.

While I have extensively reviewed his record from the past, Mr. Prendergast, with or without the advice of counsel, refused to cooperate with an examination. I am, thus, unable to render an opinion on whether or not he is mentally ill or in need of commitment, although it must be said in my several brief conversations with him, I found no evidence either from my observations at the time or from his current institutional record to suggest that he might be depressed or mentally ill.

I feel strictly from his psychiatric record that he needs ongoing psychotherapy and strongly suggest that if he receives a sentence in this matter that ongoing treatment and monitoring of his relationship with his wife which he resumed be made a strict condition of that sentence.[4]

While I am unable to provide definitive statements based on his psychiatric examination, I would be more than happy to discuss any aspect of his case, his psychiatric history, and conditions under which his need for psychotherapy might be optimally met.

At his deposition, Koson testified that he considered the various opinions and impressions contained in the McLean record and Prendergast's Bridgewater file to be in conflict and that, without an examination, he believed it would have been both unlawful and unethical to recommend that Prendergast be committed.

Prendergast was discharged from Bridgewater on September 28, 1979, and sentenced to six months' incarceration at the Billerica House of Correction. On October 18, Steven Alari, a counselor at Billerica who had worked with Prendergast in a department store some seven or eight years previously, filled out an application on Prendergast's behalf for jail credits for the time that Prendergast had spent at Bridgewater. Towards the end of October, Prendergast asked Alfred Donovan, a "crisis intervention worker" at Billerica, to submit his parole application to the Middlesex County Commissioners, who sat as the county parole board. In early November, Prendergast was granted 58 days of jail credit for part of the time he spent at Bridgewater, and his institutional discharge date was moved up from March 10 to January 12, 1980.

On November 5, 1979, the prisoner "classification" or "contract board" at Billerica reviewed the intake record on Prendergast. The intake worker who was handling Prendergast's case informed the contract board of Prendergast's prior hospitalization at McLean and Bridgewater and that, in addition to the charge of threats for which he was currently incarcerated, there were three other incidents of threatening or harassing behavior on his probation records. However, the contract board was not able to obtain Prendergast's McLean or Bridgewater records, because he refused to consent to their release. Furthermore, the intake worker informed the contract board that she had been unable to obtain any information concerning Prendergast from the Stoughton District Court, because

---

4. Koson testified that both Prendergast and Dr. Fein had informed him that Prendergast had resumed his relationship with his estranged wife. In fact, it appears that Prendergast had not resumed a relationship with his wife.

Prendergast had never been assigned a probation officer. Based on the information before it, the contract board deemed Prendergast eligible for furlough.[5]

On November 7, 1979, the contract board assigned Diane Levesque to be Prendergast's counselor, and approved his application for a one-day furlough to be taken on November 22. On November 19, Prendergast's application for a 48-hour release furlough was granted for December 7–9. Prendergast completed both of these furloughs without incident.

On December 7, 1979, the Middlesex County Commissioners denied Prendergast's petition for parole on the basis of a report from Thomas Cavanaugh, the Chief Probation Officer of the Stoughton District Court. The Cavanaugh report, which was concurred in by a state district court justice, related the concerns which Dr. Fein had expressed to the court concerning Prendergast's recent medical history and likely dangerousness. The County Commissioners forwarded the parole file, which included the Cavanaugh report, to Billerica via interoffice mail.

On December 17, 1979, Prendergast's parole file was received at Billerica by Alfred Donovan, who was handling the processing of parole requests at the time. Donovan recorded the denial of Prendergast's parole and reported the contents of the Cavanaugh report to Steven Alari, who he mistakenly thought was Prendergast's counselor. The Cavanaugh report was not brought to the attention of anyone else at Billerica.[6]

In late November or early December, Prendergast received an additional 21 days of jail credit for the remainder of the time he spent at Bridgewater prior to sentencing, and his institutional discharge date was moved up to December 22, 1979. Prendergast's third furlough was approved for a 48-hour period running from December 19–21. Prendergast was released on furlough on December 19, 1979, and the following day he kidnapped and murdered Patricia Gilmore.

## II.

The district court granted summary judgment in favor of the defendants on plaintiff's section 1983 claims. The court held that the undisputed facts, even when viewed most favorably to the plaintiff, did not make out a case under section 1983.

---

5. The furlough program at Billerica was instituted in 1972 pursuant to Mass.Gen.Laws ch. 127, § 90A (1984), which authorizes the temporary release of "committed offender[s] under prescribed conditions." The Department of Corrections regulations implementing the statute provided that "[t]he facility administrator shall develop a written procedure for reviewing applications for furlough for those inmates eligible for furlough...." Mass. Admin. Code tit. 103, § 946.05 (1979).

In turn, the "General Guidelines Governing Furlough" in effect at Billerica during the period in question provided in pertinent part that "[t]he decision to grant a resident a furlough as part of his classification plan" was to be based on a consideration of the following factors: offense, institutional performance, resident's ability to conduct himself responsibly while in the community, prior furlough history, past history of escapes, length of sentence, cases pending and/or warrants, judgment whether the resident can be trusted to return at the designated time and not commit any criminal acts while on furlough, the need for community reintegration, and ability to obtain an acceptable furlough sponsor.

6. The General Guidelines Governing Furlough in effect at Billerica provided,

CANCELLATION OF FURLOUGH
Any officer or employee of the Sheriff's Department who receives any information which may affect the release of a resident already approved for a furlough shall bring such information immediately to the attention of the Master, and the furlough supervisor, or other person in charge of the House of Correction when the Master is not present at the facility. The Master, furlough supervisor or person in charge shall take appropriate steps to insure that under no circumstances shall the resident be released from the facility until the matter in question is resolved. Steps shall include, but not be limited to, immediate notification of outer control personnel not to allow the resident to be released.
This provision apparently required Donovan and Alari to notify their superiors of the Cavanaugh report; it is unclear, however, whether either Donovan or Alari knew that Prendergast had already applied and been approved for his third furlough at the time the report was received.

On appeal we likewise conclude that plaintiff has failed to make out a basis for recovery under section 1983.

The underlying question is whether the failure of state psychiatrists, county prison officials and other county employees to protect Patricia Gilmore from attack by a private third party is actionable under 42 U.S.C. § 1983 (1982).[7] For there to be a cause of action under section 1983, the state defendants must have deprived the plaintiff of a right "secured by the Constitution and laws" of the United States. It is argued here, as it has been in other cases, that the state defendants, by reason of their inept failure to secure Prendergast and provide adequate safeguards for his announced victim, deprived the victim of her right secured by the fourteenth amendment not to be deprived of life without due process of law. The fourteenth amendment, however, does not protect against the deprivation of life *by any person at all*, but only against the deprivation of life *by the state* without due process.[8] Where, as in these circumstances, the victim dies at the hands of a private individual who was neither an agent of the state nor employed by the state, can it be said that *the state* deprived her of life without due process? If not, there was no violation of the fourteenth amendment, even though the failure of state officials to protect the victim contributed to her death.

A growing number of courts, including the Supreme Court in *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), have wrestled with this issue in analogous situations, answering the question whether there has been constitutional violation with, for the most part, a qualified "no."[9] The situation in the case at bar differs markedly from that where the state defendants themselves kill the victim—as when a police officer wrongfully shoots someone, thus implicating the state directly in the taking of the victim's life. *See, e.g., Kibbe v. City of Springfield*, 777 F.2d 801 (1st Cir.1985), *cert. granted*, —— U.S. ——, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986).

In *Martinez*, the victim was tortured and murdered by a parolee, who had previously been convicted of attempted rape, five months after the parolee was released from prison. A section 1983 action was brought against the state officials responsible for his release. In denying relief, Justice Stevens wrote for a unanimous Court,

> Appellants contend that the decedent's right to life is protected by the Fourteenth Amendment to the Constitution. But the Fourteenth Amendment protected her only from deprivation by the "*State* ... of life ... without due process of law." Although the decision to release Thomas from prison was action by the State, the action of Thomas five months later cannot be fairly characterized as state action. Regardless of whether, as a matter of state tort law, the parole board could be said either to have had a "duty" to avoid harm to his victim or to have proximately caused her

---

**7.** Section 1983 provides in pertinent part,

*Civil action for deprivation of rights*

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

As the language of the statute indicates, section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694, n. 3, 61 L.Ed.2d 433 (1979).

**8.** Section 1 of the fourteenth amendment provides in part, "nor shall any State deprive any person of life, liberty, or property, without due process of law...."

**9.** *See, e.g., Jones v. Phyfer*, 761 F.2d 642 (11th Cir.1985); *Jackson v. Byrne*, 738 F.2d 1443 (7th Cir.1984); *Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir.1983), *cert. denied*, 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984); *Fox v. Custis*, 712 F.2d 84 (4th Cir.1983); *Bowers v. DeVito*, 686 F.2d 616 (7th Cir.1982).

death, ... we hold that, taking these particular allegations as true, appellees [*viz.*, the state defendants] did not "deprive" appellants' decedent of life within the meaning of the Fourteenth Amendment.

Her life was taken by the parolee five months after his release.[10] He was in no sense an agent of the parole board.

[10] Compare the facts in *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), where local law enforcement officials themselves beat a citizen to death.

444 U.S. at 284–85, 100 S.Ct. at 559 (citations omitted) (emphasis in original).

The reason a state's failure to provide adequate protection does not normally violate the due process clause was suggested by the Seventh Circuit in *Bowers v. De-Vito*, 686 F.2d 616 (7th Cir.1982). After emphasizing that section 1983 imposes liability only if there is a deprivation of a constitutional right, the court stated,

There is a constitutional right not to be murdered by a state officer, for the state violates the Fourteenth Amendment when its officer, acting under color of state law, deprives a person of life without due process of law.... But there is no constitutional right to be protected by the state against being murdered by criminals or madmen. It is monstrous if the state fails to protect its residents against such predators but it does not violate the due process clause of the Fourteenth Amendment or, we suppose, any other provision of the Constitution. The Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order.

686 F.2d at 618 (citation omitted). This, we agree, is the nub of the issue.[10] To accept plaintiff's thesis that the various alleged errors by state psychiatrists, and by county officials and employees that resulted in Prendergast's release on furlough, violated the fourteenth amendment would require us to hold that the fourteenth amendment not only protects against the misuse of force by the state, but directs the state to protect its citizens against the violence of others. Nothing in the fourteenth amendment or its history, however, suggests that it was written to provide an expansive guarantee of state protective services.

It would seem from what we have just said that we should affirm without more. However, both the Supreme Court in *Martinez* and various circuit courts, including the Seventh Circuit, have indicated that in some special circumstances, where a state has assumed a "special custodial or other relationship" in respect of a particular person, the state's failure to protect that person might implicate the due process clause.[11] *Fox v. Custis*, 712 F.2d 84, 88 (4th Cir.1983) (collecting cases). We must inquire, therefore, whether any such special circumstances exist here.

In the vast majority of cases which have found the existence of a "special relationship" between the state and the plaintiff giving rise to an affirmative duty of care or protection under the fourteenth amendment, the plaintiff has been in state custody or care at the time of the alleged injury. Thus, it has been held that the fourteenth amendment bars the states from acting

**10.** In so saying, we recognize certain special exceptions. *See* discussion *infra.* We also recognize that if state officers conspire with criminals or madmen, intending to harm the victim, deliberately release a criminal or madman, *the state* might then be said to have deprived the victim of life, liberty, or property. But if state officials (absent "special circumstances," *infra* ) do no more than act erroneously—even if the error is egregious—and the killer is not an officer of the state but is a private third party, we think the essential element of the state's having worked a deprivation is missing. In the present situation, what the state has done is fail to provide the victim protection—a failure which, though perhaps wrong in our view, is not a violation of the due process clause any more than is a fireman's nondeliberate error in failing to rescue someone from a burning building.

**11.** There is no claim here that the defendants' failure to protect Gilmore deprived her of equal protection of the laws. *See, e.g., Bowers v. De-Vito*, 686 F.2d at 618; *Thurman v. City of Torrington*, 595 F.Supp. 1521 (D.Conn.1984).

with deliberate indifference towards the safety or welfare of prison inmates, *see, e.g., Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (incorporating eighth amendment prohibition against "cruel and unusual punishments" against the state); *Miranda v. Munoz,* 770 F.2d 255 (1st Cir.1985) (same), children in the custody and care of state social service agencies, *see e.g., Doe v. New York City Department of Social Services,* 709 F.2d 782 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983), and persons in the care of state hospitals, *see, e.g., Morrison v. Washington County,* 700 F.2d 678 (11th Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983).

Generally speaking, all of these cases can be read for the proposition that, if the state takes a person into custody or otherwise assumes responsibility for that person's welfare, a "special relationship" may be created in respect of that person, and the fourteenth amendment imposes a concomitant duty on the state to assume some measure of responsibility for the person's safety and well-being. *See also Ellsworth v. City of Racine,* 774 F.2d 182 (7th Cir. 1985) (suggesting that municipality may assume a "special relationship" in respect of municipal employee by virtue of employment relationship, requiring municipality to provide police protection), *cert. denied,* —— U.S. ——, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986).[12]

In *Martinez,* the Supreme Court gave only vague hints as to what circumstances, if any, might create such a special relationship and render the state liable for a parolee's crime. It emphasized that Thomas had killed his victim five months after his release, implying, perhaps, that the long lapse of time could have made some difference in its analysis. It also emphasized that "the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger." *Martinez,* 444 U.S. at 285, 100 S.Ct. at 559. Finally it said, "We need not and do not decide that a parole officer could never be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole." *Id.* Beyond these remarks, the Court did not suggest what "special circumstances" limits there might be to its holding.

The above qualifications in *Martinez* do leave the door slightly ajar in the present case. Some of the instant defendants knew or should have known that Prendergast posed a special danger to Patricia Gilmore, as distinct from the public at large. Moreover, Gilmore was murdered but one day after Prendergast's release on furlough. In our view, however, whatever significance these factors may have as a matter of state tort law, they did not create a special relationship of constitutional dimension between the state and Gilmore. *See Beard v. O'Neal,* 728 F.2d 894 (7th Cir.) (fifth amendment due process clause did not impose affirmative duty on FBI informant to prevent police officer from murdering known victim), *cert. denied,* —— U.S. ——, 105 S.Ct. 104, 83 L.Ed.2d 48 (1984).

It is argued that because at least some of the defendants knew or should have known that Prendergast posed a special danger to Patricia Gilmore, they had a constitutional duty to protect her. But irrespective of any knowledge the state defendants had of the special danger that Prendergast posed to Gilmore or the temporal proximity between Prendergast's release on furlough and Gilmore's murder, the state did nothing to render Gilmore any more or less capable of defending herself from a violent attacker than any other member of the general public. Furthermore, even though Prendergast was legally in state custody while on furlough,[13] Prendergast was in no

---

**12.** In citing to these and other circuit cases which go beyond addressing the medical needs of prison inmates, *see Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), we do not mean to signal our agreement (or dis-

agreement) with the application of law made on the particular facts of each case.

**13.** Mass.Gen.Laws ch. 126, § 16 (1984), provides in part,

sense an agent of the state. The state played no part in creating the threat that Prendergast posed to Gilmore, Prendergast's murderous design was independently conceived and executed, and the state neither condoned nor encouraged his behavior. *See Martinez,* 444 U.S. at 285, 100 S.Ct. at 559; *Estate of Bailey v. County of York,* 768 F.2d 503, 513 (3d Cir.1985) (Adams, J., dissenting); *Beard v. O'Neal,* 728 F.2d at 899; *Fox v. Custis,* 712 F.2d at 87 n. 2.[14]

For there to be a special relationship implicating the fourteenth amendment, we believe the state must be more directly implicated than it was here in the events causing the victim's death—as, perhaps (although we need not decide), when the state, by exercising custody or control over the plaintiff, effectively strips her of her capacity to defend herself, or affirmatively places her in a position of danger that she would not otherwise have been in. Here, the state and county defendants did not have custody or control over Gilmore, nor did they condone, ratify or in any way instigate Gilmore's homicidal encounter. *See, e.g., Jackson v. City of Joliet,* 715 F.2d 1200, 1204–05 (7th Cir.1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984). Because there was no special relationship of constitutional dimension between Gilmore and the state, we hold that the plaintiff has failed to make out a violation of the fourteenth amendment and a claim under section 1983.

We recognize that a few courts have held or suggested that a state defendant's knowledge that a third party poses a special danger to an identified victim will alone support a claim for relief under section 1983.[15] In our view, however, absent a clear federal statutory or constitutional mandate, the development of state and municipal tort liability in this area is best left to state courts and legislatures. *See Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). We agree with Judge Adams's recent remarks that

[section] 1983 was enacted to deal primarily with acts of discrimination by state officials. There is a danger that by extending this important legislation to contexts far removed from Congress' original and overarching purposes, a national state tort claims act administered in the federal courts in effect will be created. Steps in that direction should not be lightly taken since the ultimate outcome of such a course might well be incongruent with our role as federal judges. When a court extends a statute far beyond what was contemplated by Congress, it transgresses the separation of powers.

*Estate of Bailey v. County of York,* 768 F.2d 503, 513 (3d Cir.1985) (Adams, J., dissenting).

Enormous economic consequences could follow from the reading of the fourteenth amendment that plaintiff here urges. Fire-

---

The sheriff shall have custody and control of the jails in his county, . . . and of all prisoners committed thereto, and shall keep the same himself or by his deputy as jailer, superintendent or keeper, and shall be responsible for them. . . .

14. We also note that the plaintiff has failed to cite any provisions of state law that either imposed a constitutionally cognizable duty on the defendants to protect Gilmore, or afforded her an entitlement to protection. Although Mass. Gen. Laws ch. 123, § 15(e) (1984), authorized the state defendants to petition for Prendergast's commitment, *see* note 2, *supra,* it did not require them to do so. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

15. *See, e.g., Estate of Bailey v. County of York,* 768 F.2d 503 (3d Cir.1985) (survivors of child

murdered by her guardians stated a cause of action under section 1983 against state social service agency, although child was not in legal custody of the state, and child's guardians were not under state control or supervision); *Jones v. Phyfer,* 761 F.2d 642 (11th Cir.1985) (where plaintiff was attacked by furloughed inmate, court suggested that it might have found a special relationship if plaintiff had alleged that defendants knew that she, as distinguished from the public at large, faced a special danger); *Beck v. Kansas University Psychiatry Foundation,* 580 F.Supp. 527 (D.Kan.1984) (survivors of hospital employees murdered by inmate shortly after his release from state penitentiary stated a cause of action under section 1983 where prison authorities allegedly knew of special danger inmate posed to the decedents).

men who have been alerted to a victim's peril but fail to take effective action; municipal ambulances which, when called, arrive late; and myriad other errors by state officials in providing protective services, could all be found to violate the Constitution. It would seem appropriate that the citizenry, acting though state legislatures and state courts, should determine how far it wishes to go in reimbursing claims of this type. We can see no justification for rewriting the due process clause of the federal Constitution so as to construct a basis for relief that can more flexibly be provided elsewhere, if that is deemed advisable.

### III.

Because we conclude that the plaintiff has not stated a cause of action under section 1983, we need not address the defendants' argument that, following *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* —— U.S. ——, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) and *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the existence of an adequate remedy at state law precludes the plaintiff's claims. Nor need we express any view as to whether any of the individual defendants' conduct was less than reckless or grossly negligent, or whether they might be entitled to the defense of qualified immunity.

Of course, our opinion expresses no view on the merits of the plaintiff's claims under the tort law of Massachusetts or any other state.

*Affirmed.*