Annette DIMAS, Plaintiff,

v.

The COUNTY OF QUAY, NEW MEXICO; Doyle W. Frazier, Bruce A. Runyan, Robert E. Thraser, County Commissioners; the Quay County Jail; and Phil Snedeker, Sheriff of Quay County, Defendants.

Civ. No. 88–0924 JP.

United States District Court, D. New Mexico.

Jan. 25, 1990.

**374**

Antonio V. Silva, Silva, Silva & Herrera, P.C., El Paso, Tex., and Manuel J. Lopez, Las Cruces, N.M., for plaintiff.

Samuel J. Aguirre and Frank N. Chavez, Campbell, Reeves, Chavez and Acosta, P.A., Las Cruces, N.M., for defendants.

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

The subjects of this Opinion and Order are defendants' Motion for Judgment on the Pleadings brought pursuant to Federal Rule of Civil Procedure 12(c) and plaintiff's Motion to Disqualify Defendant's Counsel. On February 7, 1989, I entered an Order stating that I would treat defendant's motion for judgment on the pleadings as one for summary judgment under Federal Rule of Civil Procedure 56. In my February 7th Order, I permitted the parties to conduct limited discovery on the issues pertaining to the motion for summary judgment. Having considered the motions, the memoranda, and exhibits submitted in conjunction therewith, and having consulted the applicable authorities, I find that defendants' motion should be granted and plaintiff's motion should be denied.

This is a civil case arising from the rape of plaintiff by a prisoner two days after he was placed on a work-release program by the defendants. Counts I, II, IV, and V allege that the defendants were negligent with regard to their official duties and caused plaintiff's injuries. Count III alleges that defendants breached their duty to warn plaintiff and the general public of the prisoner's allegedly mistaken release and dangerous propensities. Counts VI and VII, based on 42 U.S.C. § 1983, allege a violation of plaintiff's substantive due process rights and the deprivation of her liberty rights without due process of law. Defendants have moved for summary judgment only on counts VI and VII.

### I. *Summary Judgment on Counts VI and VII*

■ Summary judgment is an integral part of the Federal Rules of Civil Procedure which are intended to " 'secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (quoting Fed.R. Civ.P. 1). A motion for summary judgment is proper only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

For purposes of this analysis, I will take the Plaintiff's statement of material facts as true. I will assume: that the prisoner, Darrell Ferguson, at the time of his release, had a criminal history consisting of commercial burglary, larceny, residential burglary, assault with a deadly weapon, possession of a firearm, assault, battery, and possession of stolen property; that Ferguson had at one time been a fugitive from Roswell, New Mexico, and was con-

sidered an escape risk; that Defendant Snedeker, the sheriff of Quay County who placed Ferguson on the work release program, never ran a criminal background check on Ferguson prior to granting him a work-release furlough; that before placing Ferguson on furlough, Sheriff Snedeker failed to obtain the necessary approval of Judge Frost, who had sentenced Ferguson to confinement in the Quay County jail; that Sheriff Snedeker placed Ferguson on furlough without any statutory authority and in violation of his own policy of placing only misdemeanor prisoners on the work-release program; that Sheriff Snedeker authorized Ferguson to go to Amarillo, Texas on May 29, 1987; that Ferguson used and dealt drugs while on furlough; and that Ferguson had a previous social relationship with the plaintiff.

However, none of these facts form the basis of a suit against the defendants under 42 U.S.C. § 1983. To state a claim under § 1983, the plaintiff must establish that a person acting under color of state law deprived her of a constitutionally-protected right. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). To fulfill the state action requirement, plaintiff attempts to draw a direct line from the state officials' actions to Darrell Ferguson's reprehensible criminal conduct in raping plaintiff. Obviously, there is a causal connection between the release of the prisoner by defendants and plaintiff's injuries. One can state that "but for" defendants' release of the prisoner, the plaintiff would not have received her injuries on May 31, 1987 because Darrell Ferguson would have been in jail and unable to reach her. However, the United States Supreme Court has stated, "[a]lthough a § 1983 claim has been described as 'a species of tort liability,' ... it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute." *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481, *rehearing denied*, 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980). The United States Supreme Court has expressed an unwillingness to find state action where the injuries

were at the hand of a third party. *See Martinez, supra; DeShaney v. Winnebago County Dept. of Social Services,* —— U.S. ——, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

## A) THE UNITED STATES SUPREME COURT CASES

In *Martinez*, a fifteen year old girl was murdered by a man who had been paroled from prison five months earlier. *Id.* 444 U.S. at 279–280, 100 S.Ct. at 556. The defendants in *Martinez* were the state officials responsible for the decision to parole the murderer. *Id.* at 279, 100 S.Ct. at 556. The Supreme Court found that the state officials had not deprived the victim of life without due process of law. *Id.* at 285, 100 S.Ct. at 559. "Although the decision to release Thomas from prison was action by the State, the action of Thomas five months later cannot be fairly characterized as state action." *Id.* at 284–285, 100 S.Ct. at 559. The Court stated, "[h]e was in no sense an agent of the parole board.... Further, the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger." *Id.* at 285, 100 S.Ct. at 559.

The Supreme Court recently expanded on the *Martinez* decision in *DeShaney*. Petitioner in *DeShaney*, a minor represented by his mother, was severely beaten by his father rendering petitioner mentally retarded. *Id.* 109 S.Ct. at 1002. The respondents, the county department of social services and several of its social workers, had received several complaints about possible child abuse by the father and even had petitioner in their custody at one point. *Id.* at 1001–1002. However, they released the petitioner back into the father's custody, and subsequently the father beat petitioner severely enough to damage his brain. *Id.* at 1002. Petitioner argued that the respondents had deprived him of his liberty without due process of law by failing to intervene to protect him against a risk of which they knew or should have known. *Id.*

The Supreme Court refused to find that the state's failure to protect the petitioner constituted a violation of the Due Process Clause. *Id.* at 1007. The Court in *DeSha-*

*ney* noted that several appellate courts had interpreted *Martinez* as implying that "once the State learns that a third party poses a special danger to an identified victim, and indicates its willingness to protect the victim against that danger, a 'special relationship' arises between State and victim, giving rise to an affirmative duty, enforceable through the Due Process Clause, to render adequate protection." *Id.* 109 S.Ct. at 1004, n. 4. However, the Court rejected the argument that a "special relationship" arises in such a case. *Id.* The Court explained that in certain limited circumstances the Constitution imposes affirmative duties of care and protection with respect to particular individuals. *Id.* at 1004–1005. These affirmative duties arise when the State takes a person into its custody and holds him there against his will. *Id.* at 1005. In these circumstances, the Constitution, through the Eighth Amendment, imposes upon the State a duty to assume some responsibility for the prisoner's safety and general well-being. *Id.; See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their "reasonable safety" from themselves and others); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (State must provide adequate medical care to incarcerated prisoners). The Court emphasized that the rationale for this principle is that:

> ... when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs ... it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."

*Id.* 109 S.Ct. at 1005–1006. The Court explained, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 1006.[1] The court distinguished the facts of the *DeShaney* case from those of *Youngberg* and *Estelle.* In *DeShaney,* the harms petitioner suffered did not occur while he was in the state's custody. *Id.* 106 S.Ct. at 1006. The court conceded that the state may have been aware of the dangers that the petitioner faced; however, it emphasized the fact that the state "played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.*

*Martinez* and *DeShaney* dictate a conclusion that the facts in the instant case are insufficient to support a claim under § 1983 against these defendants. Understandingly, the plaintiff attempts to differentiate the *Martinez* and *DeShaney* opinions from the case at hand. Plaintiff argues that her case is distinguishable from *Martinez* and *DeShaney* because: (1) the actions of the defendants in *Martinez* were taken pursuant to an "orderly" parole decision; (2) there was a five-month time lapse between the release of the prisoner and the crime committed by the prisoner in *Martinez;* (3) there was no special relationship between the victim and the parolee in *Martinez;* (4) in *Martinez,* the parolee was no longer in the defendant's legal custody when he committed the crime; and (5) in *DeShaney,* the court found that the defendants had not created the danger to which the victim was subjected.

*(1) the "orderly" parole decision*

Plaintiff argues that in *Martinez,* the Supreme Court relied on the fact that the parolee "was released from custody as a result of a formal, orderly, official determination ... which while allegedly lacking in some 'requisite formalities' nonetheless had

---

**1.** The plaintiff attempts to align her case with that of *Youngberg* and *Estelle.* However, in *DeShaney,* the Supreme Court stated that the affirmative duties in these cases arose from the limitation which it imposed on the injured party's freedom to act on his own behalf. *Id.* The defendants did not place any limitations on the plaintiff's freedom to act. Thus, *Youngberg* and *Estelle* are of no assistance to her claim.

all the characteristics of procedural regulatory sanctioned by state law." *Plaintiff's Memorandum Brief in Opposition to Defendants' Motion for Judgement on the Pleadings*, p. 10. However, the decision in *Martinez* rested on the Court's finding no state action. *Martinez*, 444 U.S. at 285, 100 S.Ct. at 559. I do not believe that this finding would have changed had the parolee been released in contravention of state law (as the plaintiff alleges happened in the present case). In fact, for purposes of their opinion, the Court assumed "that appellees knew, or should have known, that the release of Thomas created a clear and present danger such an incident would occur." *Id.* at 280, 100 S.Ct. at 556. This is essentially the same allegation that plaintiff makes in the present case. *Plaintiff's Complaint*, para. 26.

### (2) *the time lapse*

Plaintiff argues that the fact the parolee in *Martinez* committed the crime five months after he was paroled by the defendants distinguishes it from the instant case in which the crime was committed two days after the prisoner was released. *Plaintiff's Memorandum*, p. 10. However, the Supreme Court in *Martinez* could not have intended to provide a five-month due process timetable. *Janan v. Trammell*, 785 F.2d 557, 559–560 (6th Cir.1986); *see also Humann v. Wilson*, 696 F.2d 783, 784 (10th Cir.1983) ("The remoteness discussed in *Martinez* was not simply a matter of time."). The other factors considered were that the parolee was in no sense an agent of the state and that the victim did not stand in any special relationship to the parolee from which the parole officers might have inferred a special danger to her. *Humann*, 696 F.2d at 784. To begin with, plaintiff, in the case at hand, does not allege that Ferguson was an agent of the state. Secondly, as set forth below, I fail to see any evidence of a "special relationship" between the plaintiff and Ferguson that would alert the defendants to any special danger she might face in the event of his release.

### (3) *"special relationship"*

In *Martinez*, the Court stated that the decedent did not stand in any special relationship to the parolee from which the parole officer may have inferred a special danger to her. *Martinez*, 444 U.S. at 283, 100 S.Ct. at 558. Plaintiff claims that this statement distinguishes the *Martinez* case from the present case. *Plaintiff's Memorandum*, pp. 10–11. Although, plaintiff has introduced evidence that she and Ferguson had a relationship prior to the crime, (Ferguson's deposition, p. 24, 11. 3–25; p. 25, 11. 1–25; p. 26, 11. 1–19), she has introduced *no* evidence that the defendants could have known of this relationship, much less that they could have inferred a special danger to her from the relationship. The only evidence of a relationship between the two is that they had dated. (Ferguson's Deposition, p. 24, 11. 3–25; p. 25, 11. 1–25, p. 26, 11. 1–19). However, prior to the crime, the defendants had no knowledge of any relationship between the plaintiff and Ferguson. (Frost's Deposition, p. 11, 11. 15–20; Brian Runyan's Deposition, p. 13, 11. 22–25 and p. 14, 1. 1; Norman Runyan's Deposition, p. 19, 11. 12–16; Snedeker's Deposition, p. 55, 11. 12–17; Thraser's Deposition, p. 13, 11. 15–17). Furthermore, even if defendants knew that Ferguson posed a special danger to plaintiff, the Court in *DeShaney* rejected the argument that this imposes an affirmative, constitutional duty on the part of the state to protect her. *DeShaney*, 109 S.Ct. at 1004.

### (4) *legal custody of the prisoner*

Plaintiff places great weight on the fact that, unlike the parolee in *Martinez*, the prisoner in the instant case was still in the legal custody, although not actual physical custody, of the state officials when he committed the crime. In *Estate of Gilmore v. Buckley*, 787 F.2d 714 (1st Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986), a furlough case, the Court of Appeals for the First Circuit discussed the consequences of the fact that the prisoner was still legally in state custody when the crime occurred. In *Buckley*, a woman was murdered by an inmate one

day after he was sent on furlough from a jail. *Id.* at 718. The woman's estate sued the county, sheriff, county commissioners, superintendent of the jail, the medical director of the state hospital, and two psychiatrists of the state hospital. *Id.* at 715. In a manner similar to the case at hand, the plaintiff in *Buckley* alleged that "various acts and omissions of the defendants proximately caused Gilmore's murder by Prendergast [the prisoner], depriving her of life without due process of law in violation of the fourteenth amendment." *Id.* The complaint also alleged that the defendants were liable for Gilmore's death under state tort law. *Id.* The court refused to hold that the fourteenth amendment directs the state to protect its citizens against the violence of others. *Id.* at 720. As to the "custody" issue, the court stated:

> ... even though Prendergast was legally in state custody while on furlough, Prendergast was in no sense an agent of the state. The state played no part in creating the threat that Prendergast posed to Gilmore, Prendergast's murderous design was independently conceived and executed, and the state neither condoned nor encouraged his behavior.

*Id.* at 721–22. The court rejected the argument that Prendergast's being in the defendants' legal custody when he committed the crime placed a constitutional duty on the state to protect the plaintiff. *Id.*

### (5) *creation of the danger*

Plaintiff attempts to distinguish *DeShaney* by asserting, that unlike the defendants in *DeShaney*, the defendants in the instant case *did* play a part in the creation of the dangers to which she was subjected and that they made her more vulnerable to these dangers. As stated above, there is a remote causal connection between the release of Ferguson and plaintiff's injuries. However, this same remote link was present in the *DeShaney* case. "But for" the defendants placing the petitioner back into his father's care, the petitioner would not have been beaten by his father and would not have suffered the injuries which were the basis of the lawsuit in *DeShaney*. However, this is not enough to establish a

claim under § 1983. As was the case in *DeShaney*, the defendants' actions did not place plaintiff in any worse position than that in which she would have been had the state not acted in the first instance by placing Ferguson in jail. Thus, if the defendants in *DeShaney* had not acted in the first place by taking temporary custody of the petitioner, he would still have been subject to his father's abuse. Likewise, in the instant case, had the state not acted in the first place by taking custody of Ferguson, plaintiff would still have been subject to his violent actions.

### B) THE *NISHIYAMA* DECISION

Plaintiff asks this Court to look beyond the *Martinez* and *DeShaney* opinions to an opinion by the Court of Appeals for the Sixth Circuit. *Nishiyama v. Dickson County, Tenn.*, 814 F.2d 277 (6th Cir.1987). Plaintiff argues that the facts of her case are more analogous to *Nishiyama* than to *Martinez* or *DeShaney*. In *Nishiyama*, the plaintiffs' daughter was killed by an inmate driving a fully equipped official patrol car with the authorization of the sheriff and deputy sheriff. *Id.* at 278. The sheriffs had a policy and practice of allowing the prisoner to use the patrol cars, equipped with blue flashing lights and official markings, to perform official and personal tasks for the two officers and personal tasks for himself. *Id.* at 279. On the night of the murder, after allowing the prisoner to use the patrol car, the sheriff and deputy sheriff were notified by the Dickson County dispatcher that a Dickson County Sheriff's car was stopping motorists. *Id.* The sheriff and deputy sheriff did nothing. *Id.* Subsequently, the prisoner used the patrol car to apprehend the plaintiffs' daughter and murder her. *Id.*

The Court of Appeals for the Sixth Circuit found that the plaintiffs had stated a cause of action under § 1983. *Id.* at 281. It distinguished the case from *Martinez* by stating that in *Nishiyama* "the officers gave Hartman the car *and* the freedom to commit the crime." *Id.* (emphasis in the original). The car in *Nishiyama* was the necessary means to commit the crime, and

the freedom to drive the car was the specific opportunity to commit the crime. In the case at hand, one could conclude that the furlough given to the prisoner was the specific opportunity to commit the crime. However, in no sense did the defendants give the prisoner the necessary means to commit the crime. In *Nishiyama,* the defendants, through their acts, gave the murderer the "apparent authority of the patrol car to direct Kathy Nishiyama to stop several blocks from her home and thus become his victim." *Id.* at 281. In the instant case, the defendants did not give the prisoner any "apparent authority". For example, the plaintiff does not contend that she opened her door to the prisoner, Ferguson, because he displayed a police badge or other indicia of official authority given to him by the defendants. Allegedly, Ferguson broke into her house. *Plaintiff's Complaint,* para. 10. In *Nishiyama,* the victim would have never stopped her car if the prisoner was not driving a patrol car with flashing lights. There are no analogous facts in the present case. Unlike the state officials in *Nishiyama,* the defendants in this case did nothing to render plaintiff any more or less capable than any other member of the general public of defending herself from a violent attacker.

Moreover, the court in *Nishiyama* cited a furlough case, similar to the one at hand, and distinguished it from *Nishiyama* as a case in which there was not a close relationship between the criminal acts and the defendants' acts under color of state law. *Nishiyama,* 814 F.2d at 281 (citing *Jones v. Phyfer,* 761 F.2d 642 (11th Cir.1985)). In *Jones,* an elderly woman was raped in her home by a man who had been released on a furlough from a school run by the Alabama Department of Youth Services. *Jones,* 761 F.2d at 643. At the time of his furlough the rapist had an extensive criminal and troubled psychiatric history. *Id.* Using the special relationship argument, the plaintiff attempted to circumvent the basic rule that " 'the state has no constitutional duty to protect members of the general public from random criminal violence ...' " *Id.* at 646 (citations omitted); *see also De-Shaney,* 109 S.Ct. at 1004 ("As a general

matter, ... we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."). First, the plaintiff in *Jones* argued that there was a "special relationship", between herself and the young man, that distinguished her from the public at large and placed her in need of special protection. *Jones,* 761 F.2d at 646. The man had broken into plaintiff's house on a prior occasion, and she was instrumental in having him convicted and sent to the detention center. *Id.* The court refused to find that this created a special relationship that would impose a duty on the state to protect the plaintiff or to warn her of the man's release. *Id.* at 646–47.

Secondly, the plaintiff in *Jones* argued that there was a special relationship between the state officials and the general public based on the state officials' duties under state law. *Id.* at 647. The law on which she relied stated that the Department of Youth Services may, " '... after an objective consideration of all the available information ... arrange temporary return or trial visit of the youth to his own home, as often as conditions appear desirable ...' " *Id.* (quoting Alabama Code § 44–1–32). The plaintiff argued that this imposed a duty on the state officials which they breached. *Id.* The court pointed out, "[t]he fact that defendants may have violated the duties set out by state law for employees of the Department of Youth Services, does not mean that the defendants deprived plaintiff of her liberty rights without due process of law." *Id.; see also Martinez,* 444 U.S. at 285, 100 S.Ct. at 559.

■ Similar to the argument in *Jones,* the plaintiff in this case argues that defendants owed her a duty under state law to "maintain the public order", "keep a faithful and true statement of all prisoners detained under [their] charge", "obtain adequate authority for release of [the prisoner]", "formulate policies, practices and procedures to prevent the mistaken release of violent criminals", and "inspect the Quay County Jail and report violations of the law". *Plaintiff's Complaint,* paragraphs

18, 22, 23, 30, and 34. However, the fact that the defendants may have breached their duties to plaintiff based on state law does not mean that the defendants deprived plaintiff of her liberty without due process of law. *See Jones*, 761 F.2d at 647; *see also Martinez*, 444 U.S. at 285, 100 S.Ct. at 559.

In *Bowers v. DeVito*, 686 F.2d 616 (7th Cir.1982), the court suggested why a state's failure to provide adequate protection normally does not violate the Due Process Clause. The court stated:

> There is a constitutional right not to be murdered by a state officer, for the state violates the Fourteenth Amendment when its officer, acting under color of state law, deprives a person of life without due process of law. (citation omitted). But there is no constitutional right to be protected by the state against being murdered by criminals or madmen. It is monstrous if the state fails to protect its residents against such predators but it does not violate the due process clause of the Fourteenth Amendment or, we suppose, any other provision of the Constitution. The Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order.

*Id.* at 618. Accordingly, I find that the defendants did not deprive the plaintiff of her liberty within the meaning of the Fourteenth Amendment by allowing Darrell Ferguson to leave the prison on a furlough and summary judgment should be entered in favor of defendants on counts VI and VII of the Complaint.

## II. *Plaintiff's Pendent State Claims*

■ In counts I through V of her complaint, plaintiff seeks damages under the New Mexico Tort Claims Act. N.M.Stat. Ann. §§ 41–4–1 et seq. (Repl.Pamp.1989). The statute of limitations for these claims is two years from the date of the occurrence which caused the injury. N.M.Stat. Ann. § 41–4–5. Defendants released Ferguson on May 29, 1987, and plaintiff was injured on May 31, 1987. Thus, if I were to dismiss plaintiff's pendent state claims, her claims would be time barred in state court unless the defendants waive any statute of limitations defense. In view of the recent decision of the New Mexico Supreme Court in *Bracken v. Yates Petroleum Corp.*, 107 N.M. 463, 760 P.2d 155 (1988), it is unclear whether the New Mexico Supreme Court would be willing to toll the limitation period of an action during the pendency of the plaintiff's suit in federal court. It appears from the opinion in *Estate of Guiterrez v. Albuquerque Police Dept.*, 104 N.M. 111, 117, 717 P.2d 87, 93 (Ct.App.), *cert. denied*, 103 N.M. 798, 715 P.2d 71 (1986), that the Supreme Court would not be inclined to toll a statute of limitations while suit is pending in federal court. However, language at page 466 of 107 N.M. in *Bracken* (page 158 of 760 P.2d) suggests that *Estate of Guiterrez* may have been overruled on this point. Dismissing a pendent state claim which becomes time barred while a federal court has it under consideration would be improper. *Emory v. Peeler*, 756 F.2d 1547, 1555 (11th Cir.1985). Therefore, I will retain jurisdiction over the plaintiff's pendent state claims unless the defendants agree in writing, by February 7, 1990, to waive their statute of limitations defense were this case to be dismissed and refiled in state court. If defendants file a written waiver of any statute of limitations defense by February 7, 1990, I will dismiss plaintiff's state law claims.

## III. *Plaintiff's Motion to Disqualify Defendants' Counsel*

Plaintiff moved to either disqualify the counsel now representing the defendants or to require that the defendants file affidavits demonstrating their comprehension of the potential conflicts of interests. Plaintiff bases her request on *Dunton v. County of Suffolk*, 729 F.2d 903, 909 (2nd Cir.1984). The *Dunton* case was the subject of a letter that I sent to counsel in this case on April 21, 1989. In that letter I requested that each defendant in the case, who is jointly represented with any other defendant by the same attorney, file an affidavit showing that he has been in-

formed of and understands all actual or potential conflicts of interest in such joint representation, that he wishes to continue to be represented by his present lawyer, and that he waives the right to object to such joint representation at a later time. All defendants filed the requested affidavits on June 20, 1989. These affidavits satisfy my concern about the potential conflicts in joint representation. Therefore, plaintiff's motion will be denied.

IT IS THEREFORE ORDERED:

1) Defendants' Motion for Judgment on the Pleadings (filed September 19, 1988), treated as a motion for summary judgment, is granted, and partial summary judgment will be entered in favor of defendants on counts VI and VII of plaintiff's Complaint.

2) I will retain jurisdiction over plaintiff's state law claims unless defendants agree in writing, by February 7, 1990, to waive their statute of limitations defense in state court; and

3) Plaintiff's Motion to Disqualify Defendants' Counsel (filed May 26, 1989) is denied.