Janice C. BECK, et al., Plaintiffs,

v.

KANSAS UNIVERSITY PSYCHIATRY FOUNDATION, et al., Defendants.

Myrtle A. WILLIAMS, et al., Plaintiffs,

v.

KANSAS UNIVERSITY PSYCHIATRY FOUNDATION, et al., Defendants.

Civ. A. Nos. 83–2094–S, 83–2095–S.

United States District Court, D. Kansas.

May 20, 1987.

See also 671 F.Supp. 1552.

John Elliott Shamberg, Lynn R. Johnson,
David R. Morris, Ruth M. Benien, Sham-

berg, Johnson, Bergman & Goldman, Chartered, Overland Park, Kan., for plaintiffs.

Steven L. Ruddick, John C. McFadden, Sp. Asst. Atty. Gen., Kansas City, Kan., for the State of Kan.

Charles E. Simmons, Chief Legal Counsel, Dept. of Corrections, Robert R. Stephan, Atty. Gen., Leon J. Patton, James D. Hall, David D. Plinsky, Bruce E. Miller, Carl A. Gallagher, Asst. Attys. Gen., Timothy G. Madden, Sp. Asst. Atty. Gen., Dept. of Corrections, Topeka, Kan., Ronald W. Nelson, Overland Park, Kan., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

Various defendants in this action have filed motions for summary judgment.

## I. DEFENDANTS MCMANUS AND AT-KINS

Defendants McManus and Atkins have filed a motion for summary judgment, claiming that the actions taken by Bradley Boan in murdering the plaintiffs' decedents on March 20, 1981, cannot be characterized as actions taken under color of state law by the defendants Patrick McManus and Robert Atkins. The defendants further contend that the actions of McManus and Atkins are not the sort of abusive government conduct that the due process clause of the fourteenth amendment was designed to prevent. The defendants contend that the staff of the Department of Corrections (DOC) fulfilled their function, and any claim that the Department of Corrections did not provide the Kansas Adult Authority (KAA) with all relevant materials should fail. The defendants further claim they are entitled to the defense of qualified immunity. The defendants also claim that this action is barred by the eleventh amendment. In addition, the defendants contend that all of Janice Beck's, as representative of Marc Beck's estate, state law causes of action should be barred by the exclusivity of workmen's compensation.

A moving party is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir.1985). An issue of fact is "material" only when the dispute is over facts that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* The court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues. *United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir.1986). The court must also consider the record in the light most favorable to the party opposing the motion. *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir. 1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). The language of Rule 56(a) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986).

For purposes of this summary judgment motion, the following facts are uncontroverted:

1. In 1977, Bradley R. Boan plea-bargained to the crime of attempted aggravated assault in violation of K.S.A. §§ 21–3410 and 21–3301.

2. The victim of Boan's attempted aggravated assault was Charles R. Stoffer. Charles Stoffer was a psychiatrist located at Kansas University Medical Center.

3. Boan was sentenced to the custody of the Secretary of Corrections to a term of not less than one, nor more than five years, with his sentence beginning on May 6, 1977.

4. Boan was received by the Department of Corrections on September 7, 1977.

5. Upon his arrival at the penitentiary, Boan began receiving incentive good time at the rate of three days per month until December 1978, when incentive good time was discontinued. He received a total credit of forty-eight days. An inmate's conditional release date was determined by subtracting the amount of good time credit an inmate was entitled to from the inmate's maximum sentence expiration. Bradley Boan's maximum sentence expiration was May 6, 1982.

6. Two types of good time credit were available to Bradley R. Boan between 1977 and 1980—legislative or statutory good time and incentive good time. An inmate coming into the Kansas State Penitentiary in 1977 under a one to five-year sentence was eligible for two years' legislative good time credit. Boan received this two year statutory good time credit.

7. Incentive good time is awarded to an inmate by the Kansas State Penitentiary Unit Team. The award of incentive good time was based upon an inmate's good behavior, work performance, and conduct. Thus, an inmate had to earn incentive good time. The record indicates that Boan was given not only legislative good time, but forty-eight days incentive good time, thus making Bradley Boan's conditional release date March 18, 1980.

8. Upon the arrival of an inmate's conditional release date, the inmate must be released from confinement. The Kansas Adult Authority has the authority, however, to impose sufficient conditions to protect society from the inmate. The law also allows for a conditional releasee, who breaks the law or violates the conditions of his conditional release, to be returned to prison to serve out his maximum sentence.

9. Bradley Boan had no disciplinary violations while in prison. He was, however, housed in the A & T Segregation at Kansas State Penitentiary from January 29, 1980, to January 31, 1980, for mental problems.

10. Bradley Boan was conditionally released on March 18, 1980. The certificate of conditional release was issued by the Kansas Adult Authority. The Kansas Adult Authority determines whether conditions should be imposed upon conditional releasees. The Kansas State Penitentiary, however, computes the conditional release date. It was the policy of the Kansas Adult Authority in 1980 to impose no conditions on conditional releasees. The institutional staff at the penitentiary and the Department of Corrections knew that it was KAA's policy to impose no special conditions on conditional releasees. The only time the KAA considered placing conditions on a conditional releasee, including supervision, would have been when the imposition of such conditions was recommended to the KAA by the institutional staff of the penitentiary.

11. Every conditional releasee, including Bradley Boan, was required to meet two general conditions: (1) conduct himself in a law abiding manner, and (2) keep the Secretary of Corrections informed of his current address. Conditional releasees who did not obey the law, or whose release became incompatible with the best interests of society, were to be re-taken on a warrant issued by the Secretary of Corrections and re-imprisoned pending a revocation hearing by the KAA.

12. During Boan's incarceration, numerous reports were made concerning his behavior, including his mental condition.

13. The Kansas Adult Authority had complete access to all records maintained by the Department of Corrections, including material from the inmate's file at the penitentiary, and at the central office of the Department of Corrections in Topeka. As a general rule, pre-parole reports would be directly provided to the Kansas Adult Authority. It is uncertain, however, whether all Kansas State Penitentiary records were received by the Kansas Adult Authority or were properly maintained. Generally, pre-parole packets included a Kansas Reception and Diagnostic Center report, progress reports, mental health reports, and prior criminal records.

14. The Department of Corrections was obligated to provide the Kansas Adult Au-

thority with access to all inmates at the Kansas State Penitentiary and all information relevant to the Authority's release decisions concerning those inmates. It was the duty of the Penitentiary's staff to make recommendations and reports concerning an inmate's condition throughout the entire period of the inmate's incarceration, so the information would be available to the Kansas Adult Authority.

15. Arlene Sawyer, Records Clerk III at the penitentiary, would send the Kansas Adult Authority mental health reports as part of her daily routine. The Kansas Adult Authority staff received reports prepared by the penitentiary's mental health unit and would determine whether the report had to be brought to the KAA's board immediately, or whether the report could be reviewed by the board at a later date.

16. Reports, such as the KRDC evaluation, pre-parole reports, special progress reports, progress reports and psychiatric consultations, would be in the central file of the Department of Corrections.

17. Upon Boan's admission into the Department of Corrections, the Kansas State Reception and Diagnostic Center prepared an evaluation summary on him.

18. Between August 18, 1977, and March 18, 1980, numerous psychiatric consultations and pre-parole reports advised the Department of Corrections and the Kansas State Penitentiary personnel that Bradley Boan was a danger and would require supervision and medication, if not involuntary commitment, upon his release. The unit team to the Kansas State Penitentiary was in the best position to observe an inmate and his mental and medical condition on a day-to-day basis. The unit team was concerned that Bradley Boan would have trouble and problems upon release if he was not supervised.

19. On December 18, 1977, Dr. Hemaya, M.D., prepared a special progress report-psychiatric consultation for Boan.

20. On April 28, 1978, a progress report was prepared on Bradley Boan.

21. On April 28, 1978, a special progress report on Boan was prepared.

22. On June 20, 1978, a psychiatric consultation report was prepared by Dr. D.A. Kalili.

23. A pre-parole report was prepared for the benefit of the KAA on Boan on June 29, 1978.

24. A progress report was prepared on Boan on May 9, 1979.

25. Also on May 9, 1979, a special progress report was made on Bradley Boan.

26. By letter-memo, dated July 18, 1979, Devon Knoll, Kansas Adult Authority Director, advised Department of Corrections and Kansas State Penitentiary officials of the KAA's concern over Bradley Boan's mental condition. Knoll asked the Mental Health Center at the Penitentiary to see if Boan could be transferred to the Larned State Security Hospital for psychiatric treatment.

27. Dr. Hemaya, on July 1, 1979, prepared a psychiatric consultation on Bradley Boan.

28. In August 1979, Dr. Hemaya prepared a report of the psychiatric consultation of Boan.

29. On January 25, 1980, Dr. Hemaya prepared a report of the psychiatric consultation of Boan. The January 25, 1980, psychiatric consult by Rizk Hemaya notified the Kansas State Penitentiary and the Department of Corrections that Bradley R. Boan was still angry and upset at the people who caused his imprisonment and was threatening revenge and potential violence upon release. The report concluded that Boan needed medication and psychiatric treatment and was a danger, mostly to others. At that time, Dr. Hemaya prescribed Thorazine and Cogentin for Bradley Boan. The prescription was renewed on January 29, 1980, when Boan was placed in A & T Segregation. In Hemaya's comments, the doctor noted that Bradley Boan had difficulty controlling his temper and had an explosive personality.

30. Boan's conditional release certificate was issued by the KAA on January 7, 1980. Upon the penitentiary's receipt of the notice of the KAA's order to release

Boan on March 18, 1980, the penitentiary's attorney, Charles Simmons, reviewed Boan's institutional history. Simmon's review of February 21, 1980, determined that Boan could not be involuntarily committed as a mentally ill person. It should be noted that Simmons had no psychological or psychiatric training.

31. At the time Charles Simmons prepared his February 21, 1980, memo, he did not have any personal contact with Bradley Boan. Simmons had reviewed the psychiatric reports and knew that they consistently said that Boan was a danger or needed treatment. Simmons asked Sidney Zuberg if Bradley Boan had ever committed an act of hurting someone or himself. Zuberg told him that he had not observed any such act. On February 21, 1980, when Zuberg spoke with Simmons, he stated that Bradley Boan just sat in his cell and stared into space.

32. Relying on his attorney's investigation and advice, the director of the penitentiary, Robert Atkins, agreed that a petition to have Boan involuntarily committed would not be filed. Robert Atkins did not review Boan's file prior to agreeing to Simmons' recommendation that no involuntary commitment be sought for Boan. Simmons did not provide a copy of his February 21, 1980, memo to the Kansas Adult Authority, or advise the KAA of the Department of Corrections' determination that they would not seek civil commitment for Bradley R. Boan.

33. On May 10, 1980, Boan was admitted to the Osawatomie State Hospital on an emergency basis after he threatened his parents.

34. A petition for the involuntary commitment of Bradley Boan was filed by Gary Richwine on May 12, 1980. On August 14, 1980, the District Court of Wyandotte County, Kansas, ordered the release of Bradley Boan from the Osawatomie State Hospital, based on the court's finding that after three months of medication and psychiatric counseling, Boan was not mentally ill.

35. Dr. Ibarra, M.D., examined Bradley Boan for a short time on August 25, 1980.

Dr. Ibarra, at the time of his examination of Boan, knew Boan had previously been a patient of the Wyandotte County Mental Health Center and reviewed the medical records of the center. At the time of his examination, Dr. Ibarra knew Boan had been incarcerated for pulling a handgun at the Kansas University Medical Center. On August 25, 1980, Boan was polite, friendly, cooperative and respectful. Boan, at that time, was on medication prescribed at Osawatomie State Hospital. Dr. Ibarra did not find any signs or symptoms of a medical disorder at that time, but said such interview was insufficient to allow him to determine if Boan was cured.

36. The Wyandotte Mental Health Center had placed a warning in its medical records indicating that Boan had homicidal and suicidal behavior.

37. Dr. Ibarra was aware of the concern held by Dr. Kartus regarding the possibility that Boan presented a risk to the safety of Dr. Eikermann. Dr. Ibarra knew Boan had recently been discharged from the Osawatomie State Hospital. The Osawatomie State Hospital had called the Kansas State Penitentiary and was informed that Boan was taking one hundred milligrams of Thorazine and one milligram of Cogentin per day. Dr. Ibarra, while discussing the treatment plan with Boan on August 25, 1980, believed that the most important element of his treatment plan was that Boan was to continue to take his medications. Boan told Ibarra that he did not feel that he needed medication and that he did not intend to take it. Dr. Ibarra did not inform anyone of Boan's statement that he was going to discontinue treatment and that Boan was going to discontinue taking his medicine.

38. When Bradley Boan was released by the Kansas Adult Authority pursuant to a certificate of conditional release, the Authority understood that he would not be supervised and that no conditions were placed upon him. The institutional staff at the Kansas State Penitentiary and the Department of Corrections knew that it was the KAA's policy to impose no special con-

ditions on conditional releases, so they recommended none.

39. From the time of Boan's release from prison on March 18, 1980, until he murdered the plaintiffs' decedents on March 20, 1981, Boan was not arrested or charged with having committed any crimes. Neither the Kansas Adult Authority nor the Department of Corrections, however, had any procedure or mechanism to learn if a conditional releasee was abiding by the law.

40. There is no procedure for routing new information to the Kansas Adult Authority after an inmate is continued to conditional release, or for the Authority to review the inmate's file or take any other action.

41. The KAA should have been aware of the January 25, 1980 psychiatric consult report. Keith Magers, Kansas Adult Authority Director, does not recall receiving any information from the Department of Corrections as to the finding of Dr. Hemaya that Boan presented an element of dangerousness to others, and the recommendation that Boan be hospitalized.

42. On January 29, 1980, Bradley Boan was taken to the Kansas State Penitentiary Infirmary and then to A & T Segregation because of mental instability and a problem with a guard. Boan remained in A & T Segregation from January 29 to January 31, 1980.

43. The Kansas Adult Authority assumed that if the Department of Corrections determined an inmate was dangerous while confined, the Department of Corrections would civilly commit the inmate. Robert Atkins, Director of the Kansas State Penitentiary, did not know the Kansas Adult Authority was relying on the Penitentiary to seek involuntary commitment for dangerous inmates.

44. An inmate on conditional release was required to serve one year before receiving final discharge, unless his sentence expired earlier. The Department of Corrections determined an inmate's due date for final discharge and routinely requested the Kansas Adult Authority to issue the certificate of discharge. Bradley Boan was issued his final discharge on March 5, 1981.

45. Boan's certificate of discharge was issued by the Kansas Adult Authority. Kansas Adult Authority Director, Elizabeth Denney, signed Boan's certificate of discharge. The final discharge certificate was issued by the Kansas Adult Authority staff upon notice from the Kansas State Penitentiary staff. The Director of the Kansas Adult Authority that issued Boan's certificate of discharge also compiled parts I and II, and sections A and B of the KRDC report. The remainder of the report was prepared by Charles Wilds and Carl Targownick, both psychiatrists.

46. Dr. Marc Beck was murdered by Bradley Boan while Dr. Beck was serving a residency at the University of Kansas Medical Center treating patients at the Center's emergency room.

47. Patrick McManus was the Secretary of Corrections for the State of Kansas. Robert Atkins was the Director of the Kansas State Penitentiary.

### Conclusions of Law

Defendants McManus and Atkins have requested summary judgment, citing the plaintiffs' failure to state a cause of action pursuant to 42 U.S.C. § 1983. Defendants contend that they have no relationship of constitutional import with the plaintiffs. Essentially what the defendants contend is that while the decision to release Boan from incarceration was an action by the State, the action of Boan at the Kansas University Medical Center cannot be characterized as state action. In response, the plaintiffs contend that section 1983 allows recovery against the state official who puts into motion a chain of causation or a series of acts by others that ultimately results in a constitutional deprivation. Plaintiffs further argue that there is a special relationship or a special danger which exists and state action may be found under the circumstances of this case. Plaintiffs claim that a special relationship existed by virtue of the fact that the individual Department of Corrections defendants, the individual members of the KAA, Bradley Boan, the

University of Kansas Medical Center and the plaintiffs had a special relationship to the extent of the defendants' knowledge of the special danger that Boan posed. Plaintiffs claim that this issue involves proximate cause on foreseeability determinations which cannot be made in this motion for summary judgment.

The United States Supreme Court has addressed an analogous situation in *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). The action in *Martinez* arose out of a murder of a fifteen-year-old girl by a parolee. The complaint alleged that the parolee was convicted of attempted rape in 1969. He was first committed to a mental hospital and thereafter sentenced to a term of imprisonment of one to twenty years, with the recommendation that he not be paroled. Nevertheless, five years later, the parole board decided to parole Thomas to the care of his mother. The parole board had been informed of the parolee's history and propensities, and the likelihood that he would commit another violent crime. Five months after his release, Thomas tortured and killed the deceased. The complaint alleged that the parole board knew or should have known that the release of Thomas created a clear and present danger, that such an incident would occur. Plaintiffs claimed not only negligence on the part of the parole board, but also reckless, willful, wanton and malicious conduct. *Id.* at 279–280, 100 S.Ct. at 556. The trial judge sustained a demurrer to the complaint and his order was upheld on appeal.

The Supreme Court could not accept plaintiff's contention that the immunity statute of the eleventh amendment deprived Thomas' victim of her life without due process of law, because it condoned a parole decision that led indirectly to her death. The Court then turned to plaintiff's claims under section 1983, which stated that the parole board's action in releasing Thomas subjected the deceased to a deprivation of her life without due process of law. The Court found that although the decision to release Thomas from prison was action by the state, the action of Thomas five months later could not be fairly characterized as state action. *Id.* at 284–85, 100 S.Ct. at 558–59. The Supreme Court, however, limited its holding by declaring that under the particular circumstances of the case, the decedent's death was too remote a consequence of the parole officers' action to hold them responsible under the federal Civil Rights law. *Id.* at 285, 100 S.Ct. at 559.

In a more recent case, *Davidson v. Cannon*, 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677, 682 (1986), the United States Supreme Court found that the due process clause of the fourteenth amendment is not implicated by the lack of due care of an official causing unintended injury to life, liberty or property. The Court held that "where a governmental official is merely negligent in causing the injury, no procedure for compensation is constitutionally required." *Id.* (citing *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).

In the Pre-trial Order, plaintiffs contend that the defendants McManus and Atkins deprived the plaintiffs of the rights, privileges and immunities guaranteed to them by the Constitution of the United States, including the fourteenth amendment due process right to be free from bodily harm, injury or death as a result of state action. Plaintiffs further contend that the acts and omissions of the defendants were negligent and that such negligence was the direct and proximate cause of their injury. Specifically, plaintiffs claim that defendants were negligent and violated the plaintiffs' civil rights because they knew or should have known of the special relationship between Boan, the University of Kansas Medical Center, and its employees, and the increased danger to such persons that Boan represented because of this relationship. The defendants allegedly were negligent in their failure to protect these individuals by insufficiently providing the necessary medical, psychiatric and other records and information to the KAA for its consideration and determination. The plaintiffs further charge that these individuals incorrectly calculated and determined Bradley Boan's conditional release and final discharge

dates for use by the KAA. Finally, plaintiffs· claim that these acts constituted gross negligence and that said acts were carried out and committed with such reckless and wanton disregard and intentional and deliberate indifference to their probable and foreseeable consequences to entitle the plaintiffs to damages.

Another decision which addresses the viability of a section 1983 claim against probation and parole officers is *Fox v. Custis,* 712 F.2d 84, 86–89 (4th Cir.1983). In *Fox,* the complaint alleged that Mason, who had been convicted in 1976 of arson and grand larceny, was sentenced to a term of twenty years, with ten years suspended in the state penitentiary. Members of the parole board possessed sufficient information of Mason's propensities for arson, sexual aberrations, and other criminal behavior, to alert them of his dangerousness. Within three weeks of his release, he defrauded an innkeeper. On May 8, Mason was convicted of this offense and given a thirty-day suspended sentence. Chandler and Custis were aware of Mason's conviction and considered it to be a violation of his terms of parole. Custis and Chandler notified Mason that this was a violation of his parole and for that, parole could be revoked. Custis and Chandler also suspected that Mason had committed an act of arson on May 1st, that resulted in one woman's death. Mr. Custis, however, recommended that Mason be continued on parole. The defendants nevertheless did not revoke Mason's parole, but left him free. On May 14, Mason set fire to Fox's home, raped, beat and set on fire Lisa Morris, and shot and stabbed appellant Wendy Morris. The plaintiffs' claims in *Fox* alleged that the negligent actions of the parole officers deprived appellants of constitutionally protected rights without due process of law. It was claimed that these acts were done under color of state law. The district court dismissed the section 1983 claim on the authority of *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). In *Fox,* the Fourth Circuit noted the distinctions between the facts in *Martinez* and the facts presented in *Fox.*

The time interval between state conduct and victim injury was considerably shorter here; and the defendants here, unlike the *Martinez* defendants,· have responsibility for the post-release supervision of the parolee. (Footnote omitted.) In another respect, obviously significant in the *Martinez* analysis, the facts are ·similar: here· too the defendants were unaware that the claimant-victims, as distinguished from the public at large, faced any special danger.

*Id.* at 87.

Based on the distinctions between the ·two cases, the court determined that an approach which concentrated primarily upon the exact nature of the constitutional rights protected by section 1983, rather than upon the remoteness of the injury from state action, should be applied. The court noted that any analysis under section 1983 begins with recognition that this section "only protects against actions under color of state law that subjects … any citizen … or other person … to the deprivation of any rights … secured by the Constitution and laws of the United States." *Id.,* (citing *Baker v. McCollan,* 443 U.S. 137, 146–47, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979)). Therefore, the court found that the first inquiry it must make is whether the plaintiff had been deprived of a constitutional right. That, in turn, involved an isolation of the particular constitutional infringement complained of. *Id.* (citations omitted).

In *Fox,* the claimants asserted the right not to be injured in their persons or property by the irresponsible failure of the state to protect them against any risks of harm posed to them by a state parolee under the direct supervision of the state's agents. With one qualification, the court agreed with the decision of *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982). In *Bowers,* the Seventh Circuit held that there simply is " 'no constitutional right to be protected by the state against … criminals or mad men, and that because, in corollary, there is no constitutional duty [on the state] to provide such protection, its failure to do so is not actionable under section 1983.' " *Fox,* 712 F.2d at 88, (quoting *Bowers,* 686 F.2d

at 618). The court in *Fox* qualified this general rule by holding such a right or duty may arise out of a special custodial or other relationship created or assumed by the state in respect of particular persons. *Id.* The court distinguished cases which involved inmates in the state's custody, whom the state knew to be under specific risk of harm from themselves or others in the state's custody or subject to its effective control from cases where the plaintiffs were not under the control of the state. *Id.* (citations omitted).

In a Tenth Circuit case, *Humann v. Wilson,* 696 F.2d 783 (10th Cir.1983), the plaintiff was a victim of a rape committed by a Mr. Clark. Her assailant was an inmate at the Denver Community Corrections Facility, known as the William Street Center. The Center allowed the inmates a good deal of freedom in and interaction with the community. Mr. Clark had been placed at the Center by the Chief of Community Corrections for the Colorado State Department of Corrections. The placement was recommended by members of the parole board. The rape was committed within two months of Mr. Clark's taking up residence at the Center.

Plaintiff brought that action in district court under 42 U.S.C. § 1983, claiming that the defendant's conduct in allowing the inmate the amount of freedom constituted negligence, and was the cause of her injuries. The district court dismissed the claims on two grounds—one, that the crime was too remote from state action to constitute a valid civil rights claim and, second, that the parole officers enjoy absolute immunity. The Tenth Circuit affirmed, stating that the remoteness doctrine discussed in *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) did not involve solely a matter of time. *Id.* at 784. The court found that other factors were observed in *Martinez.* The court further observed that a parolee is in no sense an agent of the state in choosing to commit a crime. The court further found that the decedent did not stand in any special relationship to the parolee from which the parole officers might have inferred a special danger to exist between the parolee and the plaintiff. The court found that these conditions contributed to the finding in *Martinez* as to the remoteness of crime from any action by the state. 696 F.2d at 784. The Tenth Circuit, however, limited its holding by quoting the Supreme Court's statement in *Martinez:* " 'We need not and do not decide that a parole officer could never be deemed to 'deprive' someone of life by action taken in connection with the release of a prisoner on parole.' " *Id.* at 784 (quoting *Martinez,* 444 U.S. at 285, 100 S.Ct. at 559).

In a very recent case, *Carlson v. Conklin,* 813 F.2d 769 (6th Cir.1987), the Sixth Circuit also found that a complaint of kidnapping and sexual assault by the victim, which was brought under section 1983 against the Director of Corrections, failed to state a claim upon which relief could be granted. In *Carlson,* plaintiff was abducted, sexually assaulted and robbed by defendant Conklin. Conklin had been convicted of armed robbery and assault with intent to commit armed robbery. At the time of his assault upon the plaintiff, Conklin was serving a sentence for the armed robbery in a community corrections center or halfway house. The complaint alleged that the Director of the Department of Corrections knew that dangerous prisoners, such as Conklin, were regularly being placed in such halfway houses and that it was reasonably foreseeable that the placement of such prisoners would lead to assaults on members of the communities. Thus, plaintiff claimed that Johnson owed a duty to the plaintiff as a member of the general public, and that such duty was violated when Johnson, as Director of Corrections, acted with gross negligence and in wanton disregard of the plaintiff's federal Constitutional rights.

The court in *Carlson* noted that the *Martinez* decision, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), had been relied upon repeatedly to deny relief under section 1983 in cases where plaintiffs were harmed by criminals who were formerly, or were never in the custody of state officials. *Id.* at 772 (citing *Jones v. Phyfer,* 761 F.2d 642 (11th Cir.1985)); (*Wright v. City of Ozark,*

715 F.2d 1513 (11th Cir.1983); *Fox v. Custis*, 712 F.2d 84 (4th Cir.1983)). The court also cited to the Sixth Circuit's earlier decision in *Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir.1986), for its finding that the proper analysis of whether a special relationship exists between the criminal and the victim, or between the victim and the state, or whether there is some showing that the victim, as distinguished from the public at large, faces a special danger by the parolee's release. 813 F.2d at 772.

The Sixth Circuit, in *Conklin*, found that while the one purpose of incarceration is to protect the public, the various, and sometimes conflicting, responsibilities that state law places upon the Department of Corrections do not create a responsibility under the federal Constitution to protect the public from convicted criminals. The court therefore reached the conclusion that the complaint failed to allege that Johnson, as Director of the Department of Corrections, deprived plaintiff of any Constitutional rights. *Id.* at 772.

In the case of *Gilmore v. Buckley*, 787 F.2d 714, 720 (1st Cir.1986), the Sixth Circuit addressed the issue of special relationship in the context of determining whether a state's failure to provide adequate protection falls within the Due Process Clause. The court noted that the Supreme Court in *Martinez* and various other circuit courts have indicated that in some special circumstances "where a state has assumed a 'special custodial or other relationship' with respect to a particular person, the state's failure to protect that person might implicate the due process clause." *Id.* at 720, (quoting *Fox v. Custis*, 712 F.2d 84, 88 (4th Cir.1983)). The court noted that the vast majority of the cases cited involved situations where a special relationship was found to exist between the state and the plaintiff on the basis that the plaintiff had been in state custody or care at the time of the alleged injury. 787 F.2d at 720. The First Circuit found that the cited cases could be read for the proposition that "if the state takes a person into custody, or otherwise assumes responsibility for that person's welfare, a 'special relationship' may be created in respect of that person,

and the fourteenth amendment imposes a concomitant duty on the state to assume some measure of responsibility for the person's safety and well-being." *Id.* at 721.

In *Gilmore*, the court found that some of the defendants knew or should have known that the inmate posed a special danger to the plaintiff as distinct from the public at large. The court further found that Gilmore was murdered but one day after the inmate's release on furlough. The court ruled that despite the significance these factors may have had as a matter of state tort law, they did not create a special relationship of Constitutional dimension between the state and the plaintiff. *Id.* at 721. The court's rationale for this holding was:

> [t]he state did nothing to render Gilmore any more or less capable of defending herself from a violent attacker than any other member of the general public. Furthermore, even though Prendergast was legally in state custody while on furlough, Prendergast was in no sense an agent of the state. The state played no part in creating the threat that Prendergast posed to Gilmore, Prendergast's murderous design was independently conceived and executed, and the state neither condoned nor encouraged his behavior.

*Id.* at 721–722 (citations omitted).

In dicta, the court held that for there to be a special relationship implicating the fourth amendment, the state must be more directly implicated than it was under the facts in *Gilmore*. *Id.* at 722. Such as when the state, by exercising custody or control over the plaintiff, effectively strips her of her capacity to defend herself or affirmatively places her in a position of danger that she would not have otherwise been in. *Id.*

After reviewing the applicable case law, the court finds that the record does not support plaintiffs' claim that a special relationship existed between the parties implicating the fourteenth amendment. The allegations of the plaintiffs in the record presented indicates that Boan

did have a violent history and the reports and evaluations made while Boan was incarcerated do suggest that Boan should have received treatment after his release. The court finds, however, that even though plaintiffs have sufficiently stated a cause of action under the theory of negligence, the actions of the individual defendants Atkins and McManus, as members of the Department of Corrections, are too remote from the deaths of Marc Beck and Ruth Rybolt to hold these defendants liable under section 1983. The court therefore finds that plaintiffs have not sufficiently established a special relationship between the victims and Boan or between the victims and the state, or a showing that the victims, Marc Beck and Ruth Rybolt, as distinguished from the public at large, faced a special danger. Thus, defendants Atkins and McManus' motion for summary judgment on plaintiffs' section 1983 claims against them should be granted.

■ The plaintiffs have also brought claims against the defendants McManus and Atkins for state law claims of intentional infliction of emotional distress, outrage and nuisance. The defendants contend that these pendent state tort claims must be dismissed because there is no federal jurisdiction question upon which pendency of state law claims can be maintained. This court recently discussed this court's jurisdiction over pendent state law claims when all federal claims have been dismissed. In *Kraemer v. Padgett*, No. 86–2126 (D.Kan., *unpublished*, May 6, 1987), the court recognized that federal jurisdiction no longer existed as the claims under § 1983 and RICO had been dismissed. Slip op. at 14. The court noted that in *Rosado v. Wyman*, 397 U.S. 397, 404, 90 S.Ct. 1207, 1213, 25 L.Ed.2d 442 (1970), the United States Supreme Court ruled that the mootness of a federal question did not deprive a federal court of the power to hear pendent state claims. In *Transok Pipeline Co. v. Darks*, 565 F.2d 1150, 1155 (10th Cir.1977), the Tenth Circuit interpreted this decision to mean that exercise of power over state claims is permissible despite dismissal of federal claims where substantial amounts of time and energy have been spent in the case. Slip op. at 15 (citing *Transok Pipeline*, 565 at 1155). The court noted that whether or not the district court exercises the power to hear pendent state claims is a matter of discretion. *Id.*

In *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), the United States Supreme Court provided a guide to be used to determine whether a district court should hear the pendent state claims of a plaintiff. It determined that jurisdiction should not be routinely exercised without considering the advantages of judicial economy, convenience, and fairness to the litigants. *Id.* at 545, 94 S.Ct. at 1383. In light of the abundance of material filed so far in this case, the inordinate amount of discovery which has taken place, the date on which this case was filed, and the May 26, 1987 trial setting, the court finds that it will exercise its discretion to hear the pendent state law claims of the plaintiffs.

■ Plaintiffs contend that the defendant Patrick McManus and Robert Atkins, as employees and administrative heads of the Kansas Department of Corrections of the Kansas State Prison, were negligent and that such negligence was the direct and proximate cause of their injury. Plaintiffs further contend the acts, errors and the omissions of the defendants, and each of them, constituted intentional infliction of emotional distress, outrage and a nuisance. Defendants McManus and Atkins contend that these state law claims are barred because they possessed quasi-judicial or prosecutorial immunity. Specifically, defendants contend that the decision of whether to implement the revocation proceedings that culminated in the presentation of a conditional release to the KAA involves both a decision to prosecute and the issuance of a warrant. *See* K.S.A. § 75–5217.

The court notes, however, that defendants raise this defense to plaintiffs' section 1983 claims. Defendants make no reference to the Kansas Tort Claims Act and its exceptions under 75–6104(a) and (b) as a defense against plaintiffs' state law claims. While not purporting to rule on these de-

fenses, the court does note that a recent decision by the District Court of Shawnee County, Kansas in *Mangus v. The State of Kansas,* Case No. 84–CV–366 (*unpublished,* Feb. 6, 1985), may refute these defenses. In that opinion, the District Court of Shawnee County held that the mere presence of some legislative power is insufficient to grant absolute immunity to a governmental entity exercising non-legislative powers. Slip op. at 14–15 (citing *Cook v. City of Topeka,* 232 Kan. 334, 337, 654 P.2d 953 (1982)). *See, e.g. Jackson v. City of Kansas City,* 235 Kan. 278, 283, 680 P.2d 877 (1984) (Employees compliance or noncompliance with its employing department's rules and regulations is not within the legislative function exception of K.S.A. § 75–6104(a)). The decision in *Cook v. The City of Topeka,* 232 Kan. 334, 335–338, 654 P.2d 953 (1982), defines judicial function within the meaning of K.S.A. § 75–6104(b). As the court stated earlier, however, it declines to raise these defenses or rule on their merits in the absence of a motion made by the defendants. The court therefore finds that the state law claims raised by Ruby Shannon, as Administratrix, against these defendants are still pending in this action.

■ The court will now address the defendants Atkins and McManus' claims that Janice Beck's, as representative of Marc Beck's estate, claims against these defendants are barred by the exclusivity of the Workmen's Compensation Act. In resolving this issue, the court is faced with a unique situation wherein one employer, the Veterans Administration, was the sole source of wages for Marc Beck. It also is undisputed that Marc Beck was killed while working as a resident at the Kansas University Medical Center. Thus, defendants contend that Dr. Beck's exclusive remedy against the University of Kansas for injuries sustained in the course of his employment is through the Kansas Workmen's Compensation Act, K.S.A. § 44–501 *et seq.* Defendants contend that even if Beck was in the employ of a third party, the V.A. Hospital, since he was performing work that is a part of the business of the University of Kansas Medical Center, his exclu-

sive remedy is against the University of Kansas. Dr. Beck's status, either as an employee of, or a statutory employee of the University of Kansas, bars any claim against fellow employees McManus and Atkins. The defendants further cite to the exception of Kansas Tort Claims Act, § 75–6104(f), which provides a bar to any claim by an employee of a governmental entity arising from the tortious conduct of another employee of the same governmental entity, if such claim is compensible pursuant to the Kansas Workmen's Compensation Act.

In response, plaintiffs claim that the Kansas Workmen's Compensation statutes cannot limit Beck's recovery because McManus and Atkins were not co-employees within the provision of K.S.A. § 75–6104(f). Specifically, plaintiffs claim that Marc Beck's claim was not compensible pursuant to the Kansas Workmen's Compensation Act as no benefit was ever paid. The plaintiffs contend that Marc Beck died an employee of the Federal Veterans Administration. It is undisputed that the Veterans Administration paid Marc Beck's funeral and burial expenses. The Federal Employees' Compensation Act, not the Kansas Workmen's Compensation Fund, paid the death benefit owed. Plaintiffs cite to the documents of the Veterans Administration which evidence that Marc Beck was a V.A. employee and that he died while on duty for the Veterans Administration. Finally, plaintiffs claim that the exclusive remedy provisions of the Kansas Workmen's Compensation statutes do not preclude Marc Beck from recovery where the conduct of the defendants McManus and Atkins was intentional. Finally, plaintiffs claim that the third-party assault by Boan is not compensible under the Kansas Workmen's Compensation statute. Thus, Marc Beck's remedies are not barred by the exclusivity provision.

The court can summarily dismiss plaintiffs' contention that third-party assaults are not compensible under the Kansas Workmen's Compensation statute. In *Rajala v. Doresky,* 233 Kan. 440, 443, 661 P.2d 1251 (1983), the Kansas Supreme

Court definitively stated that it was not its prerogative to modify the exclusivity of the Workmen's Compensation Act by judicially carving out an exception for intentional torts. *Id.* at 443.

The court will next address plaintiffs' argument that Marc Beck was an employee of the V.A. Hospital and not Kansas University Medical Center, and therefore not compensible under the Kansas Workmen's Compensation Act. Defendants contend that K.S.A. § 44–503 directly relates to this type of situation. Section 503(a) provides:

> [w]here any person ... undertakes to execute any work which is a part of his trade or business or which he has contracted to perform on contracts with any other person ... for the execution by, or under the contract, or of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any workman employed in the execution of the work any compensation under the workmen's compensation act which he should have been liable to pay if that workman had been immediately employed by him; and where compensation is claimed from or proceedings are taken against the principal, then in the application of the workmen's compensation act, references to the principal shall be substituted for references to the employer....

*Id.* While the court could find no case law involving a situation directly analogous to the situation at hand, the court finds that K.S.A. § 44–503 is applicable. The record is clear that Marc Beck was on an unpaid leave of absence from Kansas University Medical Center from July, 1980 to July, 1981. Although Marc Beck was a paid employee of the Federal Veterans Administration, on the day he died, March 20, 1981, he was working for Kansas University Medical Center in its Emergency Room.

Section 44–503(a) was designed to prevent employers from evading liability under the Workmen's Compensation Act by the evasive contracting with outsiders to do work which they would have undertaken to do as part of their trade or business. *See Ellis v. Fairchild,* 221 Kan. 702, 711, 562

P.2d 75 (1977). The test to be applied in resolving cases of this nature was stated in *Ellis:*

> In connection with K.S.A. § 44–503(a), under the Workmen's Compensation Act, this court has laid down two rather definite tests by which to determine whether the work covered by the contract is a part of the principal's trade or business, *i.e.:* (1) Is the work being performed by the independent contractor and the injured employee necessarily inherent in and an integral part of the principal's trade or business? (2) Is the work being performed by the independent contractor and the injured employee such as would ordinarily have been done by the employees of the principal? If either of the foregoing questions is answered in the affirmative, the work being done is part of the principal's 'trade or business,' and the injured employee's sole remedy against the principal is under the Workmen's Compensation Act.

*Id.* at 712 (quoting *Woods v. Cessna Aircraft Co.,* 220 Kan. 479, 553 P.2d 900 (1976)).

The record in this case indicates that Kansas University Medical Center and the Veterans Administration did have an agreement which provided the system of rotation among residents appointed by the Department of Medicine and the University of Kansas Medical Center and the Veterans Administration Hospital. The letter of appointment to Dr. Beck from Norton Greenberger, M.D., Professor and Chairman of the Department of Medicine, makes clear that Dr. Beck was appointed as resident by the Department of Medicine and the University of Kansas Medical Center. In that letter dated December 12, 1979, Dr. Greenberger noted that the Department of Medicine offers an opportunity for training, study and research in several hospitals in the Kansas City area. Thus, the court finds that there is no question that the work being performed was necessarily inherent and an integral part of Kansas University Medical Center's business. It is also undisputed that the work being performed by Marc Beck would ordinarily have been done by another resident at Kan-

sas University Medical Center. Thus, Janice Beck's, as representative of Marc Beck's estate, remedy is exclusively under the Workmen's Compensation Act.

The court also finds that the case law refutes plaintiffs' arguments that his death did not arise out of or in the course of his employment. The court notes that for the Workmen's Compensation Act, K.S.A. § 44–501 to be applicable, the injury must arise out and in the course of employment. *See Hensley v. Carl Graham Glass,* 226 Kan. 256, 258, 597 P.2d 641 (1979). In *Hensley,* an employee was installing glass around air-conditioners on the roof of a parking garage when a sniper began firing shots. Ten individuals, including Mr. Henley, were struck and either killed or injured by the sniper fire. The court in *Hensley* cited several cases to support its conclusion that the occurrence or accident resulted from a risk reasonably incident to the employment and that the employment itself brought the deceased in contact with the risk that in fact caused his death, or that his employment increased his risk. Id. at 259–60, 597 P.2d 641 (quoting *Siebert v. Hoch,* 199 Kan. 299, 428 P.2d 825 (1967)). The court noted that "[T]he pivotal question to be answered is whether the employment caused the employee to be exposed to an added risk or hazard to some degree greater than if not in his employment." *Id.* at 261, 597 P.2d 641. *See, e.g., Springston v. IML Freight, Inc.,* 10 Kan.App.2d 501, 502–03, 704 P.2d 394 (1985) (An injury by assault arises 'out of' employment when it arises out of the nature, conditions, obligations and incidents of the employment in the same manner as in any other injury).

In sum, the court finds that the exclusive remedy provisions of the Kansas Workmen's Compensation Act, § 44–501, precludes recovery for Janice Beck's state law claims. While the court recognizes that the plaintiffs received no compensation from the Kansas University Medical Center under the Workmen's Compensation Act, said benefits were compensible under the Workmen's Compensation Act. Based on this finding, the court finds that K.S.A. § 75–6104(f) bars any remedy that Janice Beck, as representative, may have against defendants McManus and Atkins.

Section 75–6104(f) of the Kansas Torts Claims Act provides:

> Any claim by an employee of a governmental entity arising from the tortious conduct of another employee of the same governmental entity, if such claim is (1) compensible pursuant to the Kansas workmen's compensation act....

*Id.* The term "governmental entity" means state or municipality. "State" as defined by K.S.A. § 75–6102 means the state of Kansas and any department or branch of state government, or any agency, authority, institution or other instrumentality. *Id.* The court interprets § 75–6104(f) to be a bar to Marc Beck's state law causes of action against McManus and Atkins. The language of 75–6104(f) clearly mandates that an employee of the State of Kansas [McManus and Atkins] shall not be liable for damages resulting from any claim by another employee [Beck] of the State of Kansas arising from the tortious conduct of the employee [McManus and Atkins] if such claim is compensible under the Kansas Workmen's Compensation Act. Based on the court's finding that Janice Beck's claims, as representative, were compensible under K.S.A. § 44–503, workmen's compensation is the exclusive remedy available to this plaintiff.

## II. DEFENDANTS CALVILLO, MILLS, DAY, ROTH, AND WALKER

Defendants Calvillo, Mills, Day, Roth, and Walker, individual members of the Kansas Adult Authority (KAA) have also filed a motion for summary judgment. The court incorporates the uncontroverted facts stated above. In addition, the court makes the following additional facts and reiterates some relevant facts in ruling on these defendants' motion for summary judgment.

1. The Kansas Adult Authority was the state adult paroling authority. In performing its duties, the KAA was guided by both statutes and regulations. In making a decision on whether to parole an inmate, the KAA would consider the Department of Corrections' inmate file, institutional re-

ports, presentence reports, reports from judges, police departments, sheriff's departments, victim(s), SRS workers, caseworkers, and people in the community who had an interest in the case. In fact, K.A.R. 45–4–1 *required* the KAA to consider the following with respect to parole and all subsequent hearings: "(a) the circumstances of the offense; (b) the presentence reports; (c) previous social history and criminal records; (d) the conduct, employment and attitude of the inmate in prison, and (e) reports of such physical and mental examinations as had been made." It was the duty of each member of the KAA to familiarize themselves with an inmate's file to make a decision regarding parole.

2. K.S.A. § 22–3712 provided the KAA with the authority to place an inmate in a diagnostic or treatment center as a condition of parole or conditional release. The KAA paroled inmates to mental institutions when they suffered from major mental illness. If no facility was available, the inmate was paroled with the requirement of treatment, so that he or she could be committed if their condition deteriorated. The condition of mental health counseling was placed on parolees whenever a consensus of three members of the KAA felt that it was in the best interest of society that the individual have counseling. The purpose of imposing conditions on inmates was to make sure the inmates obeyed the law and to ensure the public's protection.

3. In July, 1978, the KAA considered Bradley Boan for parole, refused to grant parole, and passed Boan's case until July, 1979.

4. A unit team's special progress report dated May 9, 1979, recommended Boan be paroled to a mental institution outside the Kansas City area. Other reports received from the Wyandotte County Sheriff's Department, Wyandotte County District Attorney's Office, Kansas City Police Department, and Dr. Pardo recommended against his parole. These parole reports were provided to the KAA.

5. In July, 1978, and June, 1979, Manual Pardo, M.D., (Boan's treating UMKC psychiatrist from 1973 to 1977), wrote letters to the KAA, expressing his concern that Bradley Boan harbored intense feelings of revenge against the Kansas University Medical Center staff and would return to the facility to harm others if paroled. Dr. Pardo requested that Boan receive psychiatric treatment and be banned from the KU facility.

6. A psychiatric consultation by Department of Corrections psychiatrist Dr. Hemaya, dated July 1, 1979, recommended parole to a mental institution.

7. Other psychiatric prison consults, one dated July 1, 1979, and one dated August 23, 1979, diagnosed Boan as a paranoid schizophrenic with antisocial personality disorder. Both evaluations recommended parole to a mental institution or psychiatric facility.

8. On July 9, 1979, Boan had a second parole hearing at which time his case was ordered continued. When the KAA ordered that a case be continued, it meant that the KAA wanted to study the file further or to get more information.

9. In a July 18, 1979 memo to the Kansas State Penitentiary Mental Health Clinic, KAA Director Devin Knoll asked that Boan be interviewed to determine if Boan's admission to a state mental hospital could be accomplished and requested that the Authority be notified for its further determination.

10. The Department of Corrections was responsible for transferring inmates while incarcerated to appropriate state institutions for observation, diagnosis or treatment. The Department of Corrections also had the authority to make application for civil care and treatment for inmates who required mental treatment at the expiration of their term of confinement.

11. The KAA was aware that the Department of Corrections could and had sought civil commitment under the mental illness statutes on inmates who were scheduled for conditional release, but who were still in need of treatment. The KAA, however, viewed itself to have the authority to civilly commit inmates on conditional release. The KAA did not presume the De-

partment of Corrections would seek involuntary commitment for potential releases prior to conditional release.

12. On August 23, 1979, Department of Corrections psychiatrist Rizk Hemaya prepared a psychiatric consultation which recommended Boan be paroled to a psychiatric facility and determined that Boan was in need of treatment. It is unclear whether the KAA ever received or considered this report.

13. On January 5, 1980, the KAA, upon further consideration, ordered Boan to serve his conditional release date. The decision to order an inmate to serve to conditional release is made through the participation of all Board members. The actual certification for conditional release, however, was signed by only two of the members.

14. At the time Boan's conditional release order was signed, the members of the KAA were Benjamin Day, Carol Mills, Alfredo Calvillo and Richard Walker. Simon Roth, Jr. did not join the KAA until April, 1980.

15. The order to serve conditional release meant Boan was to serve his maximum sentence minus any good time credits.

16. When an inmate arrived at his conditional release date, the law required his release from confinement, but the KAA had the authority to impose conditions on his release until the expiration of the releasee's maximum term or until he was otherwise discharged.

17. In general, the KAA did not order conditions or supervision on conditional releasees. There were some occasions, however, when orders for supervision had been made. Conditional releases could be made subject to a condition of treatment for mental illness. The KAA had a concern over the feasibility of enforcement of conditions and the level of supervision which would occur if imposed.

18. At the time the KAA ordered Bradley Boan to serve to his conditional release date, they did not order that he be supervised by a parole officer nor did they order

that he seek mental health treatment while on conditional release.

19. Once an inmate had been ordered to serve to his conditional release date, the KAA did not review the inmate's file unless additional reports were sent to them. The KAA was to be notified by its staff of the arrival of psychiatric reports from the prison which merited their attention.

20. On January 25, 1980, Dr. Rizk Hemaya prepared a psychological consult report indicating that he felt Bradley Boan presented an element of danger, mostly to others, and recommended hospitalization and psychotropic medication.

21. On January 29, 1980, Boan was taken to the Kansas State Penitentiary Infirmary, and then to the adjustment and treatment building after experiencing mental instability. He was returned to his cell on January 31, 1980.

22. Boan had no disciplinary violations while in prison.

23. On May 12, 1980, shortly after Boan's conditional release on March 18, 1980, Boan's stepfather, Gary Richwine, filed a petition in Wyandotte County District Court for the involuntary commitment of Bradley Boan. Due to the petition and order of the court, Boan was committed to the Osawatomie State Hospital.

24. On August 8, 1980, Dr. Arturo Lumapas, staff psychiatrist at Osawatomie State Hospital, informed the court that Boan's mental illness was almost in full remission from his relapse of schizophrenia. The Doctor felt, because of Boan's past history, that Boan should be slowly removed from the Hospital before finally discharging him.

25. On August 14, 1980, Bradley Boan was released from Osawatomie State Hospital by order of the Wyandotte County District Court Judge Lawrence Zukel upon a finding that Bradley Boan was not a mentally ill person. The Osawatomie State Hospital did refer Boan for an appointment with the Wyandotte Mental Health Center.

26. Dr. Guillermo Ibarra, a psychiatrist at Wyandotte Mental Health Center, briefly examined Bradley Boan on August 25,

1980. At that time, Boan told Ibarra that he did not need the medication and did not intend to take it. Dr. Ibarra did not inform anyone of Boan's statements regarding his intent to discontinue treatment and medication.

27. The KAA issued orders of final discharge for individuals on conditional release. When an individual had been on condition release for a year and had satisfied the Adult Authority that his final release was not incompatible with society, he could be given a full discharge. There was no scientific formula to determine whether final discharge was compatible.

28. From the time of Bradley Boan's conditional release on March 18, 1980, until he murdered the plaintiffs' decedents on March 20, 1981, Boan was not arrested nor charged with the commission of any crimes. Bradley Boan was involuntarily committed in May, 1980, because he threatened to kill his parents. The KAA was not informed of Boan's involuntary commitment.

29. The Kansas Adult Authority granted Boan final discharge on May 5, 1981, twelve days prior to his completion of the one year conditional release.

30. On March 20, 1981, one year and two days after his release from prison, Boan entered The University of Kansas Medical Center Emergency Room and murdered Marc Beck and Ruth Rybolt.

### Conclusions of Law

Defendants seek summary judgment contending that the plaintiffs have failed to state a claim under § 1983. Specifically, defendants charge that the plaintiffs have not sufficiently established a necessary element of "state action" to bring an action under 42 U.S.C. § 1983.

■ Based on this court's review of the applicable case law and record in this case, the court finds that defendants' Calvillo, Mills, Day, Roth and Walker's motion for summary judgment on plaintiffs' § 1983 claim should be granted. Without reiterating the analysis of the case law cited above, the court finds that the record does not support plaintiffs' claim that the requisite state action has been established. While the court finds that there has been an abundance of evidence presented to state a claim for negligence, plaintiffs have failed to establish the requisite state action to implicate § 1983. While the court recognizes that the evidence establishes that the KAA and its individual members may have reviewed the letters dated July, 1978 and June, 1979 from Dr. Pardo, Boan's treating Kansas University Medical Center psychiatrist, there is nothing in the record to indicate that Boan still harbored feelings of revenge against staff members of Kansas University Medical Center in 1980 or 1981, or that he posed as a danger to the plaintiffs. Nor was there any evidence to establish that Boan still intended to seek revenge. Thus, there is no "special relationship" as defined in the decisions of *Carlson v. Conklin*, 813 F.2d 769, 772 (6th Cir.1987) and *Humann v. Wilson*, 696 F.2d 783, 784 (10th Cir.1983). Despite the alleged knowledge of the KAA as to Boan's violent history and continuous psychiatric problems, and the alleged failure of the KAA to consider these factors in granting Boan's release without conditions, Boan's acts of violence which occurred on March 20, 1981, are too remote for the KAA's alleged negligence to be defined as acts of an agent of the state or to implicate § 1983.

The Court recognizes that in its Order of February 10, 1984, 580 F.Supp. 527, 534 (D.Kan.1984), the court found that there did exist a special duty by the KAA which would implicate § 1983. The court finds, however, that based on the full record before it, and the current case law which has directly addressed this issue, no § 1983 claim has been stated against the defendants Calvillo, Mills, Day, Roth and Walker. Analogous case law clearly negates the viability of bringing a § 1983 claim based on the facts as presented. "The state played no part in creating the threat that [Boan] posed to [Beck and Rybolt], [Boan's] murderous design was independently conceived and executed, and the state neither condoned nor encouraged his behavior." *Estate of Gilmore v. Buckley*, 787 F.2d 714, 722 (1st Cir.1986) (citations omitted).

■ The individual defendants Calvillo, Mills, Day, Roth and Walker seek summary judgment for plaintiffs' claims under the Kansas Tort Claims Act. They contend that K.S.A. § 75–6104(d), the discretionary function exception, bars any liability for their acts or omissions. K.S.A. § 75–6104 provides:

A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

(d) any claim based upon the exercise or performance, or the failure to exercise or perform, a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion be abused; ....

*Id.* As this court has earlier stated in *Beck v. Kansas University Psychiatric Foundation,* 580 F.Supp. 527, 539 (D.Kan.1984), the court must look to the "nature and quality of the discretion exercised" in determining whether or not the actions are discretionary. *Id.* (citing *Robertson v. City of Topeka,* 231 Kan. 358, 362, 644 P.2d 458, 462 (1982)). The court noted that this test includes those activities which entail the formation of governmental policy, whatever the rank of those so engaged. *Id.* (quoting *Downs v. United States,* 522 F.2d 990, 997 (6th Cir.1975). In the court's discussion, the court recognized that the KAA has the responsibility for granting conditional release and ultimate discharge of inmates. Conditional release is granted by the KAA. Any additional conditions may be imposed by the KAA. Ultimate discharge is granted to an inmate on conditional release when he has satisfied the Adult Authority that his final release "is not incompatible with the best interests of society and the welfare of the individual." *Id.* (citing K.S.A. § 22–3718). In *Beck v. Kansas University Psychiatric Foundation,* the court found that the allegations of the plaintiffs went to the exercise of discretion by the Adult Authority members. Therefore, plaintiffs' state law claims against the individual members of the Adult Authority in their individual capacity were barred by the discretionary function

exception under K.S.A. 75–6104(d). Id. at 539.

The court will now address plaintiffs' allegations against the individual defendants of the KAA, specifically Calvillo, Mills, Day, Roth and Walker in their individual capacities. In the Pre-trial Order, plaintiffs contend that the acts, errors and omissions of these defendants constituted negligence and that such negligence was the direct and proximate cause of their injury and damages. Plaintiffs further contend that the acts, errors and omissions of the defendants constituted intentional infliction of emotional distress, outrage and nuisance. Plaintiffs further allege that prior to the authorizing of the conditional release and during the entire period of the conditional release, defendants failed to take any action to determine if Bradley Boan was a danger to others, and to review the records of Bradley Boan prepared by the Department of Corrections. Plaintiffs also cite to defendants' failure to establish a procedure requiring the Department of Corrections to inform defendants that a prisoner, at the time of his conditional release, had been determined to be a danger to others, to inform themselves of the Kansas statutes and administrative regulations applicable to conditional release, and to enforce these statutes.

Plaintiffs claim negligence on the part of the defendants based on their alleged failure to supervise Bradley Boan or to establish a procedure by which defendants would be notified of Bradley Boan's acts on conditional release. Finally, plaintiffs contend that the individual defendants were negligent in failing to determine if Bradley Boan's discharge from his sentence was compatible with the interests of society.

In response to the defendants' motion for summary judgment, plaintiffs point out the fact that plaintiffs state that they do not claim the injury and damage they suffered was the result of a negligent release decision. Rather, plaintiffs contend their rights were violated because the individual members of the Kansas Adult Authority improperly and in bad faith failed to exercise any discretion whatsoever with respect

to the conditional release or final discharge of inmates. Plaintiffs further claim that the Kansas Adult Authority violated mandatory duties to review specific documents concerning Bradley Boan before he was conditionally released or finally discharged, plaintiffs are alleging that the defendants violated the clear mandate of the Kansas law, which required an inmate to serve a minimum term of one year on conditional release before final discharge.

The plaintiffs cite to the Kansas Supreme Court decision in *Beck and Williams v. Kansas Adult Authority*, 241 Kan. 13, 29–37, 735 P.2d 222 (1987). The Kansas Supreme Court noted that whether an act is discretionary depends on the totality of the circumstances. At 30, 735 P.2d 222 (citing *Carpenter v. Johnson,* 231 Kan. 783, 649 P.2d 400 (1982)). The court also cited to its decision in *Cansler v. State,* 234 Kan. 554, 675 P.2d 57 (1984). In *Cansler* the court found that no warning was given to law enforcement officers in neighboring communities after the escape of an armed and dangerous prisoner occurred. In that case, the Kansas Supreme Court held that the duties to confine and to warn were imposed by law and were ministerial, not discretionary. The court found that the plaintiff's claim was not based on how the state decided to confine or warn, but the state's failure to do so. Thus, the court held that the claim was not barred by the discretionary function exception. 241 Kan. at 31, 735 P.2d 222 (citing *Cansler,* 234 Kan. at 570, 675 P.2d 57). The Kansas Supreme Court's decision in *Beck* provided an extensive discussion as to the discretionary function exception under § 75–6104(d). The Court concluded, however, that:

> Although plaintiffs characterized the actions or omissions of the Authority as reckless, grossly and wantonly negligent, and as exhibiting intentional and deliberate indifferences to the consequences, the claim is founded upon the Authority's release of Boan from custody, without imposing conditions upon him, without attempting to enter him in a mental hospital, or otherwise securing mental treatment for him. The failure of the parole authority to carefully review all of the available records, the failure to send for other records which could have been secured, and the failure to take action which a thorough post-release review of the records would indicate were warranted, if true, may be negligence, but it is simply an exercise or failure to exercise a discretionary function or duty. It is the kind of activity of a state agency which is specifically exempted from the provisions of the Kansas Tort Claims Act.

> We do not believe that the legislature, in enacting the Kansas Tort Claims Act, intended to subject parole or probation decisions of the authorities, whether the Kansas Adult Authority or the sentencing judge, to litigation in order to determine whether the Authority or judge turned every tap and jumped through every hoop in arriving at a decision to place an inmate on parole or to impose conditions on a conditional release. It is these discretionary functions of state agencies or employees which the legislature intended to place beyond the pale of tort litigation.

> The possibility of harm to third persons exists every time a prisoner convicted of violent crime is released from custody and placed back into society, yet the time always arrives when release must be effected. A decision as to the imposition of conditions, if any, must be made. Such a decision involves the exercise of great discretion. Boan *had* to be released under state law. Whether conditions might have been imposed which would have prevented this catastrophe is an open question. Hindsight, always better than foresight, indicates some conditions *might* have had some effect. But such a decision, made now, would merely second-guess that parole authority, the agency in whose hands the legislator entrusted the discretion.

Slip op. 241 Kan. at 36–37, 735 P.2d 222. *See, e.g., Hopkins v. State,* 237 Kan. 601, 610, 612, 702 P.2d 311 (1985). *Cf. Fudge v.*

*City of Kansas City*, 239 Kan. 369, 374–75, 720 P.2d 1093 (1986) (After City adopted specific, mandatory set guidelines for police officers to use with regard to handling intoxicated persons, no discretion was left to the officers and the discretionary function exception was inapplicable.). The reasoning of the Kansas Supreme Court is sound.

Even when viewing the plaintiffs' contentions in the Pre-trial Order and the evidence proffered in a light most favorable to them, the court finds that all of the acts complained of are within the discretionary function exception of K.S.A. § 75-6104(d). The court cannot find that the individual defendants Calvillo, Mills, Day, Roth and Walker were acting outside the scope of their employment when failing to act. While the plaintiffs claim that these individual defendants were acting outside the scope of their authority, the record supports no such claim. Thus, the defendants Calvillo, Mills, Day, Roth and Walker's motion for summary judgment on plaintiffs' claims under the Kansas Tort Claims Act are granted on the basis that K.S.A. § 75-6104(d) bars any liability for these claims.

In the Court's Memorandum and Order filed on May 19, 1987, the court found that the claims of Marcia Beck, Pamela Cameron, Deanise Beck-Handler, as siblings of Marc Beck, and the claims of plaintiff Harold Williams, Harrison Williams, Jr., Harry Williams and Ruby Shannon, as siblings of Ruth Rybolt, were not cognizant under § 1983. Similarly, the claims of Janice Beck and Myrtle Williams, as parents of the deceased, also were not cognizant under § 1983. The court therefore finds that all claims brought by the above-named plaintiffs should be dismissed.

It appears an injustice that the law shields the negligence of these defendants. This court in no way condones the conduct of these defendants. Rather, the court finds that the procedures employed by the defendants should be re-examined to protect against future tragedies of this nature.

The court has no alternative but to follow the law as enacted by statute and developed by case law. The case law addressing the issues raised in this lawsuit mandates that summary judgment be granted. The court does so hesitantly. The record is replete with evidence of negligence, including but not limited to the failure to involuntarily commit Boan while incarcerated, or post-incarceration; the release by the Wyandotte Court of Boan from Osawatomie State Hospital in August of 1980; and the failure of the psychiatrists to fully and accurately examine and report Boan's condition to the appropriate authorities.

The court sympathizes with the families of Ruth Rybolt and Marc Beck and empathizes with their feelings of frustration as to the injustice this tragedy has wrought. In facing the legal issues which have surfaced in this action, a famous saying is applicable. "Too much justice becomes unjust." Some times the law is overly broad and results in the protection of the wrong people.

IT IS BY THE COURT THEREFORE ORDERED that defendants Calvillo, Mills, Day, Roth and Walkers' motion for summary judgment as to all plaintiffs' claims against them is hereby granted.

IT IS FURTHER ORDERED that defendants McManus and Atkins' motion for summary judgment as to all plaintiff Janice C. Beck's claims, as representative of the estate of Marc Beck, is hereby granted. IT IS FURTHER ORDERED that defendants McManus and Atkins' motion for summary judgment as to plaintiff Ruby Shannon's claims, as Administratrix of the estate of Ruth Rybolt, under 42 U.S.C. § 1983 is hereby granted.

IT IS FURTHER ORDERED that all claims brought by plaintiffs Marcia Beck, Pamela Cameron, and Deanise Beck–Handler, as siblings of Marc Beck, and the claims of plaintiffs Harold Williams, Harrison Williams, Jr., Harry Williams and Ruby Shannon, as siblings of Ruth Rybolt, are hereby dismissed. IT IS FURTHER ORDERED that the claims made by Janice

Beck and Myrtle Williams, as parents of the deceased, are hereby dismissed.

IT IS FURTHER ORDERED that the court will maintain jurisdiction over the pendent state claims of Ruby Shannon, as Administratrix of the Estate of Ruth Rybolt. IT IS FURTHER ORDERED that defendants McManus and Atkins' motion for summary judgment as to Ruby Shannon's, as Administratrix for the Estate of Ruth Rybolt, pendent state law claims for negligence, intentional infliction of emotional distress, outrage and nuisance is hereby denied. These claims are the only remaining claims in this case.